# LAWYER DISCIPLINARY BOARD
## INVESTIGATIVE PANEL CLOSING

**I.D. No.:** 12-01-201                 **Date Complaint Received:** April 4, 2012

**COMPLAINANT:**     Michaeleen C. Dorsey
                     1 Crestview Drive
                     Oak Hill, West Virginia 25901

**RESPONDENT:**      Stephen P. New, Esquire          **BAR NO.:** 7756
                     Post Office Box 5516
                     Beckley, West Virginia 25801

**THE INVESTIGATION OF THIS MATTER** having been completed and a report having been made to the Investigative Panel of the Lawyer Disciplinary Board, the Panel orders that Respondent be admonished and that the complaint be closed for the following reasons:

## FINDINGS OF FACT

Complainant Michaeleen C. Dorsey filed this complaint against Stephen P. New, Esquire, a licensed member of the West Virginia State Bar.

Complainant retained Respondent to represent her following a car accident on or about April 17, 2008. Complainant alleged that on or about December 10, 2010, Respondent settled the case for $15,000.00 without consulting with her and that she had previously informed Respondent that she did not want to settle for less than $20,000.00. Complainant

a0053648.WPD – AJH

alleged that Respondent did not pay her medical bills, including her chiropractic bills, despite his having told her that he would pay the bills out of her settlement funds. After approximately six (6) to seven (7) months, Complainant stated that Respondent stopped returning her telephone calls. Complainant said she finally was able to speak to Respondent's assistant and she then received a letter from Respondent dated September 19, 2011, which included a "Final Settlement Sheet" of her account. Complainant stated that Respondent's fee was reduced from $5,000.00 to $4,201.89 and claimed expenses of $789.11 referencing an attached itemized list. However, she said he did not attach an itemized list but she noted that the expenses brought the amount Respondent received as his fee back up to $5,000.00. Complainant stated that the Final Settlement Sheet also listed several outstanding medical bills to be paid totaling $3,685.50 and she was being sued by Medicare for their Lien in the amount of $2,000.00.

Respondent filed a response to the complaint on or about April 30, 2012, and stated that he filed a lawsuit on Complainant's behalf on or about March 21, 2010, after he was unable to settle the matter "pre-suit." Respondent stated that liability was contested in the case and Complainant's pre-existing conditions factored heavily in the matter. On or about December 10, 2010, the matter was settled at a court ordered mediation session attended by both Complainant and Respondent. Moreover, Respondent stated that Complainant signed an informal settlement agreement and signed a formal release of all claims on or about December 23, 2010. Complainant then received a Final Settlement Sheet which was dated

December 29, 2010, wherein Respondent's attorney fee and expenses were listed as well as "Outstanding Medical Bills to be Paid" were identified. According to the December 29, 2010 Final Settlement Sheet, Respondent received $5,000.00 as his attorney fees plus expenses, Complainant received a check in the amount of $2,354.54, and $7,645.46 was escrowed by Respondent to pay medical bills and the Medicare lien. Respondent provided copies of these documents with his response. Respondent stated that for the next six (6) months, he attempted to ascertain the amount of any Medicare lien. Respondent stated that by approximately July 2011, Complainant had become frustrated with the Medicare reimbursement process. After Complainant provided him with a letter from CMS - Medicare dated July 5, 2011, which indicated that Medicare thought Respondent was Complainant's employer, Respondent sent CMS a letter dated July 15, 2011, advising of the mistake and again requested the amount of any Medicare lien. On or about November 10, 2011, Respondent's staff again contacted MSPRC and at that time, they learned that CMS had not received Respondent's initial December 15, 2010 letter advising of a settlement and requesting Medicare's lien amount. On or about November 29, 2011, Respondent again submitted a Medicare Secondary Payer Development form, Final Settlement Detail Document, Final Settlement Sheet, and Consent to Release to CMS. On or about April 10, 2012, Respondent's staff was informed that Medicare could not speak with his office because Complainant had discharged him. This was the same day the Respondent received this complaint.

Respondent denied that he had refused to accept Complainant's telephone calls and stated that someone from his office has been in contact with Complainant on a near monthly basis. Respondent stated that it had become apparent to him that the issue with Medicare dealt with medical billings unrelated to Complainant's vehicle accident but Medicare nonetheless sought reimbursement.

On or about September 19, 2011, Respondent paid two (2) medical bills which had been listed on the December 29, 2010 Final Settlement Sheet and he kept $2,000.00 escrowed to cover any Medicare lien. Complainant was then issued a check in the amount of $3,959.50. Between September 19, 2011, and November 18, 2011, Respondent alleged that Complainant would not respond to his telephone calls regarding arranging for her to pick up this check and receive another explanation of the Medicare reimbursement issue. During that same time period, Respondent's office again submitted documents to Medicare requesting a final lien amount. Respondent stated that he believed Complainant was greatly confused by the Medicare reimbursement process during the entirety of the litigation. Respondent stated that he and his staff have attempted to explain the process to Complainant and that if she had outstanding medicals bills which related to her pre-existing medical conditions then she would have to pay those out of her own pocket because the settlement did not cover those medical bills. Respondent said that Complainant had now received a total net recovery of $6,313.00.[1]

---

[1]The correct total, pursuant to paperwork, is $6,314.04.

a0053648.WPD – AJH                                                4

Respondent also stated that he had confirmed that Medicare is owed approximately $95.00. Respondent intended to confirm zero balances for any other outstanding bills and release the net proceeds to Complainant. Respondent stated that Complainant advised him on or about April 12, 2012, that she wished to drop this complaint, and provided a copy of a letter from Complainant stating the same. However, Complainant sent a letter to the Office of Disciplinary Counsel on or about May 7, 2012, requesting that her complaint against Respondent continue as she did not want to drop the matter.

On or about June 27, 2012, the Office of Disciplinary Counsel received a copy of a letter and check Respondent sent to Complainant dated June 22, 2012. This letter referenced a check to Complainant in the amount of $1,903.60, which represented the remaining money being held by Respondent. In addition, copies of checks to Medicare and Plateau Medical Center were also included with the letter.[2]

On or about June 7, 2013, Respondent appeared at the Office of Disciplinary Counsel for a Sworn Statement. Respondent explained how money was handled by his firm, and confirmed that he has an IOLTA account as well as an operating account. Respondent explained that Complainant's numerous pre-existing conditions made settling the case difficult. Respondent denied having a conversation with Complainant regarding her alleged instruction to him not to settle for less than $20,000.00. Respondent stated that the policy limit in her case was $20,000.00. Respondent also stated that until discovery, he did not

---

[2]Medicare was paid $96.80 and Plateau Medical Center was paid $3,000.00 which was a reduced amount from its bill of $4,563.69 listed on the December 29, 2010 Final Settlement Sheet.

know the extent of Complainant's pre-existing conditions and that liability was not as clear as she had led him to believe and that some of the treatment she had received was clearly not related to her accident. Respondent stated that on the day of the mediation, the mediator discussed with Complainant which medical bills would be included and specifically told her that the chiropractic bills would not be included due to a gap in treatment. Respondent stated that he did recommend to Complainant that she accept the $15,000.00 offer after the other side stated during mediation that this was "all they were going to pay, if more was desired, it would have to come from a jury."

Respondent was also questioned about discrepancies in the two settlement sheets he had provided to both Complainant and the Office of Disciplinary Counsel. Regarding the reduction of his fee, Respondent stated that he "pretty much deduct[s from] the fee whatever the amount of the expenses were to kind of make it a nice round number." In this case, the settlement amount was $15,000.00 and he said he reduced his $5,000.00 fee (representing 33 1/3 percent) to $4,201.89. Respondent's expenses totaled $798.11, which when added to his reduced fee, brought his total disbursement from the settlement back to $5,000.00. Respondent stated that he did discuss the settlement sheet with Complainant and discussed the information listed. Respondent said that he listed the money he escrowed for outstanding medical bills and any Medicare lien on the settlement sheet. He also left the money in his IOLTA account while his office attempted to negotiate reduced amounts, as well as to confirm if any of the bills had been billed to Medicare. Respondent stated that any difference

in the bill amount from any reduction he was able to negotiate would be paid back to the client. Respondent explained that somehow during this process, Medicare mistakenly had his office listed as Complainant's employer and that he attempted to correct this mistake on a couple of occasions between December of 2010 and November of 2011. However, sometime between November of 2011 and February of 2012, Complainant "deauthorized" Respondent on her Medicare account, thereby making it impossible for him communicate with Medicare regarding any lien. Respondent stated that after receiving this complaint, he prepared a second final settlement sheet. Respondent stated that he had eventually decided to pay two (2) medical providers and to escrow only $2,000.00 for Medicare. Respondent said that in an effort to satisfy Complainant, "if there was anything else owed to Medicare or anybody else that would be on [Respondent] and would come out of [Respondent's] fee, and it has."[3] Respondent explained that the second settlement sheet was not signed because Complainant did not come in to pick up her check. The check sat in his office for approximately two (2) months until his wife and office manager, Amy New, mailed the check to Complainant via Certified Mail, which Complainant signed, claimed and cashed. Respondent believes the final correspondence Complainant received from Medicare was the payment letter he had been awaiting, however, he believed, Medicare sent it to Complainant

---

[3]Complainant had also alleged that Respondent had advanced her $500.00 cash from the settlement on the "settlement date." However, she was unclear whether this occurred on December 10, 2010, the date of the mediation session or December 23, 2010, when she signed the release, or December 29, 2010, when she received the first of two final settlement sheets. Respondent acknowledged that he did advance Complainant $500.00 after she explained to him that she did not have the money to travel to see her relatives during the holidays. Respondent also acknowledged that the advancement was not accounted for in his final settlement and disbursement of funds.

because she had "deauthorized" his office from her account. Once Respondent knew the final amount of the Medicare lien, he requested Complainant authorize him to at least confirm that amount. Once confirmed, he mailed a check to Medicare and was able to release the remaining money to Complainant. Respondent stated that all money has been paid out of Complainant's case. Respondent stated that he had intended to sit down with Complainant and explain the situation to her, but he was not able to do so because she never came back to his office to retrieve her final check.

## CONCLUSIONS OF LAW

Complainant is clearly dissatisfied with Respondent's representation. Rule 1.3 of the Rules of Professional Conduct provides that a lawyer shall act with reasonable diligence and promptness in representing a client and Rule 1.4 requires that he keep his client reasonably informed about the status of his or her case. While it is recognized that on occasion counsel may fall behind, it is expected he will take the appropriate remedial measures and not act, or fail to act, to the detriment of his clients. No professional shortcoming is more widely resented than procrastination, and Complainant's interests were delayed and could have been adversely affected by Respondent's failure to act in a timely manner. While the Investigative Panel acknowledges the difficulties Respondent had this representation, Respondent did not disburse the final amounts he held on Complainant's behalf after the December of 2010 settlement, until one and half years later and then only after the filing of this complaint. Moreover, it appears from the record in this matter that it was Complainant's efforts at

z0053648.WPD – AJH

8

communication which contributed to Respondent finally concluding his representation in this matter.   Respondent is admonished for violating Rules 1.3 and 1.4 of the Rules of Professional Conduct and for a violation of Rule 1.8(e) which provides that a lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation except that (1) a lawyer may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter; and (2) a lawyer representing an indigent client may pay court costs and expenses of litigation on behalf of a client.

Based upon a review of the record in this matter, the Investigative Panel finds that Respondent did not settle Complainant's case without her permission.  It is clear from the record that Complainant was present at the mediation session and accepted the offer of settlement.   Under Rule 1.2 of Rules of Professional Conduct, a lawyer must abide by a client's decisions in a civil case to accept an offer of settlement of a matter and that appears to be the situation in this case.

Finally, Respondent's bank records and client file have been thoroughly reviewed.[4] While it is acknowledged that the two different Final Settlement Sheets created confusion in this matter, the disbursements Respondent eventually made on Complainant's behalf were

---

[4] At his sworn statement, and upon inquiry by Disciplinary Counsel as to the difference in his signatures on his IOLTA trust account, Respondent advised that his wife, Amy New, as his office manager did sign his name to several of the checks disbursed in this matter. Respondent stated that she had done this with his permission. However, Respondent acknowledged that this was not a good practice and stated that he would take steps to ensure this office practice would not occur again.

accurate. Respondent no longer holds any money, either belonging to Complainant, himself, a medical provider, or Medicare in his IOLTA account.[5] Finally, the balance in his IOLTA account never dropped below the amount he had "escrowed" for Complainant. As no further action is warranted, this matter is closed.

\* \* \*

Pursuant to Rule 2.9(c) of the Rules of Lawyer Disciplinary Procedure, Respondent has fourteen days after receipt of this closing to object to the issuance of the admonishment. This written admonishment shall be available to the public, but shall not be reported to any other jurisdiction in which the respondent is licensed to practice law. Upon the filing of a timely objection, the Investigative Panel shall file a formal charge with the Clerk of the Supreme Court of Appeals.

**ADMONISHMENT ISSUED** and **CLOSING ORDERED** on the 26th day of October, 2013, and **ENTERED** this _31st_ day of _October_ , 2013.

_Ch. J Kai_

**Charles J. Kaiser, Jr., Chairperson**
Investigative Panel
Lawyer Disciplinary Board

---

[5]Respondent is advised that for complete compliance with Rule 1.15, Respondent should have an operating account, a client trust account, and an IOLTA account.