UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| JUSTIN HOWARD, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 6:23-cv-219-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| BELL COUNTY FISCAL COURT, et al., | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |
| | ) | |

*** *** *** ***

This matter is before the Court on several motions. First, Defendants Bell County Fiscal Court; Gary Ferguson, individually and in his official capacity as Bell County Jailer; Joshua Collett, individually and in his official capacity as Bell County Deputy Jailer; Robert Lozano, individually and in his official capacity as Bell County Deputy Jailer; and Brandi Osbourne, individually and in her official capacity as Bell County Deputy Jailer (collectively, the "Bell County Defendants") filed a Motion for Summary Judgment, [R. 85]. That motion is fully briefed. [R. 88]; [R. 95]. Also before the Court are two motions filed by Defendant Advanced Correctional Healthcare ("ACH"): a Motion to Exclude Expert Testimony, [R. 86], and a Motion for Summary Judgment, [R. 87]. Both of those motions are also fully briefed. [R. 89]; [R. 90]; [R. 94]; [R. 96]. Lastly, the Bell County Defendants filed a Motion to Allow Additional Briefing on Summary Judgment, [R. 102]. For the reasons set forth below, the Court will grant the Bell County Defendants' Motion for Summary Judgment, [R. 85]; grant ACH's Motion to Exclude Expert Testimony, [R. 86]; grant ACH's Motion for Summary Judgment, [R. 87]; and deny as moot the Motion to Allow Additional Briefing on Summary Judgment, [R. 102].

## I. BACKGROUND

On December 13, 2022, Plaintiff was arrested on charges of violating the terms of his probation. *See* [R. 85-3 (Citation and Bench Warrant)]. That evening, at around 4:30 p.m., Plaintiff was booked into the Bell County Detention Center. *See* [R. 85-6 (Facility Admission Report)]. During that booking process, the intake officer[1] asked Plaintiff a series of "standard medical questions." [R. 85-4 (Medical Questionnaire)]. When asked if he was taking medications for any health problems, Plaintiff advised that he was taking Prilosec (40 mg), "Klonodine" or Clonidine (.1 mg), Suboxone (16 mg), "Prososin" or Prazosin (2 mg), "Nightly Celexa" (40 mg), and meloxicam ("15 mg 2x daily"). *Id.* at 1. In his briefing, Plaintiff acknowledges that he had been prescribed these medications. [R. 88, pp. 2–3]. However, Plaintiff also states that he was taking Clonazepam (Klonopin), a benzodiazepine, at the time. *Id.* at 3; *see also* [R. 72, pp. 81:19–20, 87:24–25, 88:1–14 (Howard Depo.)]. There is no evidence that Plaintiff told the intake officer about that medication.

The list of prescribed medications, as provided by Plaintiff at the time of his intake, were recorded on a medical questionnaire form, signed by the intake officer. *See* [R. 85-4]. In his briefing, Plaintiff acknowledges that he "completed a Standard Medical Questions form identifying his prescribed medications," including those listed on the form and recited above, which, as mentioned, do not include a benzodiazepine. [R. 88, pp. 2–3]. The form also bears Plaintiff's signature. [R. 85-4]; [R. 72, p. 80:10 (Howard Depo.) ("That is my signature.")]. Once that form was completed, the jail officer typically made copies of it and handed it over to the "medical staff person," meaning a jail officer on "medical duty" that handed out meds and took

[1] The Facility Admission Report lists Katy Cox as the intake officer. [R. 85-6]. However, Cox testified that she did not recall if she "did or didn't" perform that intake, and the signature on the intake documents is not her own. [R. 76, pp. 15:21–25, 16:1–5]. This fact is immaterial to the Court's analysis, however.

vitals, among other things. [R. 76, pp. 21:6–25, 22:1–9 (Cox Depo.)]. The medical staff person would also ensure that an inmate's medical questionnaire was placed in the inmate's file, and a copy was provided to the facility's nurse practitioner. *Id.* at 21:16–25, 22:1–9, 23:4–25, 24:1.

During the relevant time frame, the facility's nurse practitioners were employed with ACH, which contracted with Bell County to provide onsite nursing coverage for four hours per week. *See, e.g.*, [R. 81, p. 46:5–9 (Ferguson Depo.)]. If a nurse was not onsite at the time an intake and medical questionnaire form was completed, the jail officers would place the forms in the medical room for the nurse practitioner to review when he or she next arrived at the detention center. *See* [R. 76, pp. 23:4–25, 24:1]. The nurses could be contacted by phone (call or text) during offsite hours, however. *See, e.g.*, *id.* at 24:2–10. For instance, if that inmate was taking medications, the nurse practitioners could be contacted by phone, advised of the medications, and could then "set the protocol for handling those prescriptions." *Id.* at 24:2–14. If the nurse practitioner prescribed medications, the medications and other relevant information (e.g., dosages) were recorded in a Medication Administration Record ("MAR"). *See, e.g.*, [R. 76, p. 25:2–8]; [R. 85-5]. The medical duty officers were then in charge of distributing medications to inmates and would record the dates and times that they provided the medication. *See, e.g.*, [R. 76, pp. 29:16–25, 30:1].

For example, Plaintiff's MAR indicates that he was placed on a detox protocol and provided with certain medications, in certain dosages and at certain times, during his incarceration at the Bell County Detention Center. [R. 85-5]. Missing from that MAR is any indication that Plaintiff was provided with Suboxone. *Id.* However, the testimony of record indicates that inmates at the Bell County Detention Center were *not* permitted to have narcotics like Suboxone. *See, e.g.*, [R. 77, p. 53:3–6 (Glass Depo.)]. Such narcotics would instead be substituted with other medications. *See, e.g.*, [R. 82, p. 17:9–11 (Collett Depo.)]. This was considered a "detox protocol,"

to ensure that the inmate could adjust without their narcotics prescriptions. *See* [R. 81, pp. 59:9–25, 60:1–3 (Ferguson Depo.)].

In addition to receiving their prescribed medications, an inmate could request medical assistance by completing a sick call form. On this form, the inmate reports his symptoms (e.g., headache), and the officer on medical duty would then take the necessary vitals (e.g., blood pressure, pulse, etc.). [R. 74, p. 14:2–8, 57:1–9 (Lozano Depo.)]. The medical duty officer would then call the nurse practitioner and inform her of the sick call request. *Id.* at 14:2–8. The nurse practitioner might prescribe certain medications over the phone in response to the sick call request. *Id.* at 14:8–16. For example, if an inmate completed a sick call request for a headache, the nurse practitioner might instruct the jail officers to provide five hundred milligrams of Tylenol once per day, and the medical duty officer would write this out on the form. *Id.* at 14:8–19. The form was then placed "in a little slot" for the nurse practitioner to review and sign during his or her next onsite visit. *Id.* at 14:19–25.

The testimony indicates that Plaintiff made several requests for a sick call form and to see medical personnel during his sixteen-day stay at Bell County Detention Center. *See* [R, 72, p. 133:3–24 (Howard Depo.)]; [R. 73, pp. 17:20–24, 18:13–25 (Osborne Depo.)]; [R. 74, pp. 5:3–5, 53:2–15]. He asserts that he never saw any medical personnel during that time. [R. 72, p. 89:12–18]. Then, on December 29, 2022, Plaintiff suffered a seizure. *See, e.g.*, [R. 74, p. 60:2–6]. Plaintiff was then transported to the hospital by ambulance. *See, e.g.*, *id.*; [R. 78, p. 12:3–12 (Griffin Depo.)]. He now argues that he experienced the seizure because he was not provided with Suboxone or Klonopin during his incarceration and was, as a result, in withdrawal. [R. 88, pp. 3–4].

Plaintiff filed the present lawsuit on December 8, 2023. [R. 1]. He names as defendants

Bell County Fiscal Court; Gary Ferguson, individually and in his official capacity as Bell County Jailer; Joshua Collett, individually and in his official capacity as Bell County Deputy Jailer; Robert Lozano, individually and in his official capacity as Bell County Deputy Jailer; Brandi Osbourne, individually and in her official capacity as Bell County Deputy Jailer, and ACH.[2] *Id.* Plaintiff asserts a negligence claim (Count I, against ACH only); a gross negligence claim (Count II, against ACH only); a claim under 42 U.S.C. § 1983 for showing deliberate indifference to his serious medical needs in violation of his constitutional under either the Eighth or Fourteenth Amendments (Counts III, against all Defendants); and a claim for "conspiracy to committ (sic) constitutional violations under 42 U.S.C. § 1983" (Count IV, against all Defendants). *Id.* ¶¶ 48–108.

After the close of discovery, the Bell County Defendants filed their Motion for Summary Judgment. [R. 85]. Defendant ACH also filed a Motion for Summary Judgment, [R. 87], as well as a motion seeking to exclude the expert testimony of Plaintiff's three proposed experts. [R. 86]. Those motions are fully briefed and ripe for review. *See* [R. 88], [R. 89], [R. 90], [R. 94], [R. 95], [R. 96]. Lastly, the Bell County Defendants filed a Motion to Allow Additional Briefing on Summary Judgment, [R. 102]. For the reasons set forth below, the Court will deny as moot the motion for additional briefing, but will grant the remaining motions.

## II. LEGAL STANDARD

While the Court addresses the legal standard pertinent to ACH's Motion to Exclude Expert Testimony below, it recites here the legal standard applicable to the two remaining motions, both of which seek summary judgment under Federal Rule of Civil Procedure 56.

Under Rule 56, a court may grant summary judgment if it first finds that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

[2] Plaintiff also named "Jane/John Doe Employees of the Bell County Fiscal Court." [R. 1, p. 2]. However, Plaintiff has not identified nor served any such individuals.

Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Winkler v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Anderson*, 477 U.S. at 256. That burden may be satisfied by demonstrating that there is an absence of evidence to support an essential element of the non-moving party's case for which he or she bears the burden of proof. *Celotex Corp.*, 477 U.S. at 323.

Once the moving party satisfies this burden, the non-moving party thereafter must produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205 (6th Cir. 1995) (citation omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, the Court is not obligated to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id.*

Further, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists

by "citing to particular parts of materials in the record including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

Ultimately, if the record, taken as a whole, could not lead the trier of fact to find for the nonmoving party, then there is no genuine issue of material fact and summary judgment is appropriate. *Matsushita Elec.*, 475 U.S. at 587 (citation omitted).

## III. ANALYSIS

### A. ACH's Motion to Exclude Expert Testimony, [R. 86]

The Court next addresses ACH's Motion to Exclude Expert Testimony, through which ACH seeks to exclude the opinions and testimony of three of Plaintiff's proposed experts: Dr. Michael Geci-Black, Dr. Fred Odago, and Dr. Michael McMunn. [R. 86]. ACH argues, with respect to each of those doctors, that Plaintiff violated both procedural and substantive requirements of Federal Rule of Civil Procedure 26(a)(2) and that Plaintiff's violations were neither "substantially justified" nor "harmless." *Id.*; [R. 94]; *see* Fed. R. Civ. P. 37(c)(1). Plaintiff disputes some, but not all, of the violations alleged by ACH and argues that any violations were substantially justified or harmless. [R. 90].

The discovery of expert reports and testimony is governed by Rule 26(a)(2), which requires parties to "disclose all expert witnesses whose testimony they 'may use at trial.'" *West v. Heimermann*, No. 22-3532, 2023 WL 1822210, at *3 (6th Cir. Feb. 8, 2023) (quoting Fed. R. Civ.

P. 26(a)(2)(A)). Rule 26 also requires the disclosure of certain other information, depending on "the kind of expert being offered." *Ramsey v. Lowe's Home Ctrs., LLC*, No. 6:24-CV-001, 2025 WL 2577791, at *14 (E.D. Ky. Sep. 5, 2025) (citing Fed. R. Civ. P. 26(a)(2)(B) & (C)). When an expert is "retained or specifically 'employed to provide expert testimony' on [a] party's behalf, or the expert's 'duties as the party's employee regularly involve giving expert testimony,' the party's 'disclosure must be accompanied by a written expert report.'" *West*, 2023 WL 1822210, at *3 (quoting Fed. R. Civ. P. 26(a)(2)(B)). That written report must contain certain information about the expert's opinions and qualifications, as provided by Rule 26(a)(2)(B)(i)–(vi). *See, e.g.*, *Ramsey*, 2025 WL 2577791, at *15. When a written report is not required under Rule 26(a)(2)(B), a party's expert disclosure must instead state "the subject matter on which the witness is expected to present evidence" and "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C); *see, e.g.*, *West*, 2023 WL 1822210, at *3. Regardless of whether a written report is required, a party must make its expert disclosures "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D); *see, e.g.*, *Coleman v. Wal-Mart Stores E., LP*, No. 22-CV-54, 2023 WL 7132938, at *2 (E.D. Ky. Oct. 30, 2023).

Relevant here, treating physicians are often witnesses "by virtue of their having provided treatment relative to the underlying injury claimed in the case and, to the extent they testify only to their personal actions and observations, are generally considered fact witnesses and are not subject to the disclosure requirements of [Rule 26(a)(2)]." *Ramsey*, 2025 WL 2577791, at *15 (alterations omitted) (quoting *Garrison v. Sam's E., Inc.*, No. 16-CV-152, 2018 WL 6566546, at *3 (W.D. Ky. May 24, 2018), *objections overruled*, No. 16-CV-152, 2018 WL 4355824 (W.D. Ky. Sep. 12, 2018)); *see also* Fed. R. Civ. P. 26(a)(1)(A)(i) (providing that a party must disclose "the name and, if known, the address and telephone number of each individual likely to have

discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses"). However, "when a party intends to solicit testimony from a treating physician that goes beyond the facts of diagnosis and treatment, and into areas such as causation, future treatment or impairment, the anticipated opinion testimony is subject to disclosure under Rule 26(a)(2)." *Ramsey*, 2025 WL 2577791, at *15 (quoting *Garrison*, 2018 WL 6566546, at *3). In other words, if a treating physician intends to "testif[y] 'beyond the scope' of the treatment rendered and give[] opinion testimony based on his 'scientific, technical, or otherwise specialized knowledge,' then the treating physician is . . . testifying as an expert witness, and at the very least must be disclosed according to the requirements in Rule 26(a)(2)(A) and (C)." *Id.* (quoting *McFerrin v. Allstate Prop. & Cas. Co.*, 29 F. Supp. 3d 924, 933 (E.D. Ky. 2014)).

The Court's initial Scheduling Order in this case, entered on February 28, 2024, required Plaintiff to disclose the identity of his expert witnesses and any reports or summaries mandated by Rule 26(a)(2) no later than October 15, 2024. [R. 33]. In subsequent orders, the Court extended Plaintiff's expert-disclosure deadline to January 13, 2025, [R. 53], and provided that "[a]ll fact and expert discovery shall be completed on or before September 13, 2025," [R. 68] (emphasis omitted). Per those orders, Defendants were required to disclose their expert witnesses by August 13, 2025, and dispositive motions from any party were due by October 15, 2025. *Id.*

On March 7, 2024, Plaintiff served an initial disclosure identifying "Michael Geci, M.D.," as a potential fact witness under Rule 26(a)(1)(A)(i). [R. 86-1, pp. 2–3]. Plaintiff's initial disclosure listed no fewer than thirty healthcare professionals as potential fact witnesses, but it did not identify Dr. Geci-Black or any other healthcare professional as an expert witness. *See id.* at 2–5.

On January 13, 2025—the deadline for Plaintiff's expert disclosures—Plaintiff disclosed "Paul M. Adee, C.C.M., C.C.H.P.," as an expert witness. [R. 86-2, p. 2]. Plaintiff also purported

to "reserve[] the right to call any medical providers for expert testimony at trial as listed in Initial Rule 26 Disclosures," but he did not identify any specific provider as an expert. *Id.* at 3.

On June 19, 2025, Plaintiff served a "Supplemental Rule 26(a)(2) Disclosure[]" identifying Dr. Geci-Black as an expert witness "pursuant to Rule 26(a)(2)(B)(i)–(vi)." [R. 86-3, p. 2]. Although Plaintiff cited Rule 26(a)(2)(B), his disclosure did not include a written report completed by Dr. Geci-Black; instead, the disclosure included a summary of Dr. Geci-Black's expected testimony. *Id.* According to that summary, Dr. Geci-Black was expected to testify about his treatment of Plaintiff at Pineville Medical Center, his prior interactions with Bell County Detention Center, and "generally," the administration of medical care to inmates at correctional facilities. *Id.* On June 25, 2025, Dr. Geci-Black was deposed. *See* [R. 83].

In early July 2025, several months after the expert disclosure deadline expired, Plaintiff provided notice to Defendants that a deposition of Dr. Odago was scheduled for July 29, 2025. *See* [R. 86, p. 3]; [R. 80, p. 13:14–15].[3] Plaintiff did not provide any other information about Dr. Odago or the substance of his expected testimony. *See* [R. 86, p. 3]; [R. 90, p. 6]. At the outset of the deposition, Defendants "object[ed] to the taking of this deposition to the extent that we have not received any information concerning what Dr. Odago's role was in the treatment of the plaintiff . . . nor of any opinions he [would be] offering." [R. 80, pp. 9:11–15, 13:12]. Plaintiff responded that he was "unaware of any legal authority . . . that says I can't depose a physician like Dr. Odago as a fact witness simply because he wasn't named specifically in a Rule 26(a)(1) disclosure by name." *Id.* at 13:18–22. Defendants explained that they "[did not] object to [Dr. Odago] going on as a fact witness," but that "if [Plaintiff] ask[ed] him to provide opinions, [that's] where [their] objection [was]." *Id.* at 14:1–4. Plaintiff then stated that he "[did not] know what [Dr. Odago's]

[3] Throughout this opinion and order, the Court's citations to deposition transcripts reference the page and line numbers listed on the transcripts.

opinions might be" and that "if he turn[ed] out to be some type of hybrid, we'll supplement our disclosures." *Id.* at 14:6–10. The deposition then proceeded, and Dr. Odago testified, among other things, that he is a neurologist who has treated Plaintiff since February 2023 and that, in his opinion, "it is likely that that event that was witnessed at the facility was a withdrawal event from being on medication." *Id.* at 16:11–22, 18:10–19:1, 27:1–28–19, 55:13–56:5. Plaintiff has not provided any disclosures, summaries, or reports related to Dr. Odago's testimony. *See* [R. 86, p. 3]; [R. 90, p. 6].

On September 24, 2025, the parties deposed two nurses, Rhonda White and Jessica Glass, who were employed by ACH and who worked at the Bell County Detention Center. *See* [R. 86, p. 3]; [R. 90, p. 8]; [R. 77]. That same day, Plaintiff filed a "Third Supplement Rule 26(a)(2) Disclosure[]" identifying "Dr. Michael McMunn, APRN, DNP-BC, CCHP-MH, CCHP-A," who had not been named in any of Plaintiff's prior disclosures, as an expert witness "pursuant to Rule 26(a)(2)(B)(i)–(vi)." [R. 86-4, p. 2]; *see* [R. 86-1]; [R. 86-2]; [R. 86-3]. Attached to the disclosure were a report by Dr. McMunn, signed on September 10, 2025; Dr. McMunn's CV; and Dr. McMunn's expert witness fee schedule. [R. 86-4, pp. 2, 5–15.] Dr. McMunn's report stated, among other things, that "the nurses and healthcare providers [at the Bell County Detention Center] were grossly negligent and deviated from the applicable standard of care." *Id.* at 7. Based on the parties' arguments, the Court understands that Dr. McMunn is the only one of Plaintiff's witnesses who is expected to testify to the applicable standard of care and to Defendants' alleged breaches. *See, e.g.*, [R. 86, p. 4]; [R. 89, pp. 7–8]; [R. 90, pp. 8, 13]. Dr. McMunn has not been deposed. *See* [R. 90, pp. 7–8, 12]; [R. 94, pp. 8, 13–14].

In its Motion to Exclude Expert Testimony, ACH argues that the testimony of Drs. Geci-Black, Odago, and McMunn should be excluded because Plaintiff's disclosures were either

untimely (with respect to Drs. Geci-Black and McMunn) or nonexistent (with respect to Dr. Odago). [R. 86, pp. 6–8]. ACH further argues that Plaintiff's written summary of Dr. Geci-Black's expected testimony does not meet the substantive requirements of Rule 26(a)(2)(C) and that Dr. McMunn's written report does not meet those of Rule 26(a)(2)(B). *Id.* at 7–10. Plaintiff does not contest that his disclosures were untimely, but he argues that these failures were harmless with respect to Dr. Odago and were substantially justified and harmless with respect to Dr. McMunn.[4] [R. 90, pp. 4–9]. Plaintiff also argues that his summary of Dr. Geci-Black's expected testimony and Dr. McMunn's report satisfied the substantive requirements of Rule 26(a)(2). *Id.* at 5–6, 10–12. The Court finds that Plaintiff's improper disclosures were untimely and such untimeliness was neither substantially justified nor harmless, and it will therefore grant ACH's Motion to Exclude Expert Testimony.[5]

Regarding the parties' timeliness arguments, Plaintiff expressly concedes that his disclosure of Dr. McMunn was untimely and that he has not disclosed Dr. Odago at all. [R. 90, p. 6]. To the extent Plaintiff argues that his disclosure of Dr. Geci-Black was timely because he "identified Dr. Geci-Black in the Initial Disclosures as the 'Emergency Department Physician' with 'knowledge regarding the Plaintiff's medical records, treatment and injuries'" and "provided Supplemental Disclosures on June 19, 2025, summarizing Dr. Geci-Black's opinions," *id.* at 5–6, his argument is without merit. As noted above, the Court's amended Scheduling Order required Plaintiff to file his expert disclosures by January 13, 2025. [R. 53]. Although Plaintiff disclosed Dr. Geci-Black as a potential fact witness in March 2024, *see* [R. 86-1, pp. 2–3], he did not disclose

[4] As explained below, Plaintiff makes no argument that his untimely disclosure of Dr. Geci-Black was either justified or harmless.

[5] Because the Court will exclude these three experts based on the untimeliness of Plaintiff's disclosures, the Court need not address the parties' arguments about the substantive requirements of Rule 26(a)(2)(B) and (C).

Dr. Geci-Black as an expert witness until June 2025, *see* [R. 86-3, p. 2], over five months after he was required to do so. It is well established that "[d]isclosing a treating physician as a fact witness is not a substitute for designating the same physician as an expert." *Alexander v. Walgreens Co.*, No. 18-CV-069, 2019 WL 6736227, at *3 (W.D. Ky. Dec. 11, 2019) (quoting *Roark v. Speedway, LLC*, No. 13-CV-139, 2015 WL 12978822, at *4 (E.D. Ky. Apr. 6, 2015)); *accord Ramsey*, 2025 WL 2577791, at *15. Because Plaintiff did not disclose Dr. Geci-Black as an expert witness until well after the expert-disclosure deadline had passed, his disclosure was untimely.

Because the record demonstrates, and Plaintiff does not dispute, that his expert disclosures were untimely, the Court turns immediately to whether Plaintiff's failures were "substantially justified" or "harmless." Fed. R. Civ. P. 37(c)(1). When a party "fails to provide information or identify a witness as required by Rule 26(a)," Rule 37(c)(1) provides that the party is "not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." *Id.*; *see, e.g.*, *Clark v. Louisville Jefferson Cnty. Metro Gov't*, No. 17-CV-419, 2023 WL 2316205, at *2 (W.D. Ky. Mar. 1, 2023) ("The exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless." (quoting *Dickenson v. Cardiac & Thoracic Surgery of E. Tenn. P.C.*, 388 F.3d 976, 983 (6th Cir. 2004))).

To determine whether a party's failure to timely disclose an expert is substantially justified or harmless, courts in the Sixth Circuit are guided by five factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015) (quoting *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396–97 (4th Cir. 2014)); *see, e.g.*, *RJ Control Consultants, Inc. v.*

*Multiject, LLC*, 100 F.4th 659, 668–71 (6th Cir. 2024) (applying the *Howe* factors); *Ramsey*, 2025 WL 2577791, at *18–19 (same). The party "that has violated Rule 26 bears the burden of showing that the violation 'was either justified or harmless.'" *In re FTCA Flint Water Cases*, No. 17-CV-11218, 2025 WL 3451642, at *7 (E.D. Mich. Dec. 1, 2025) (quoting *Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 782 (6th Cir. 2003)). The Court first addresses Drs. Geci-Black and Odago and then turns to Dr. McMunn.

As discussed below, Plaintiff makes some effort to address each of the *Howe* factors with respect to Dr. McMunn. With respect to Drs. Geci-Black and Odago, however, Plaintiff addresses none of those factors. *See* [R. 90, pp. 4–6]. Indeed, Plaintiff makes no Rule 37 argument at all concerning Dr. Geci-Black, *see id.* at 4–5, and his only Rule 37 argument regarding Dr. Odago is a bare assertion that because "Defendants were aware of Dr. Odago through medical records produced in discovery" and "examined him fully" at his deposition, "[t]here has been no surprise and no prejudice," *id.* at 6.[6]

Because Plaintiff makes no attempt to show that his failure to timely disclose Dr. Geci-Black was either justified or harmless, he cannot carry his burden under Rule 37(c)(1). *See, e.g.*, *Dickenson*, 388 F.3d at 983; *Johnson*, 325 F.3d at 782; *Robards v. BLK Out Transp.*, 623 F. Supp. 3d 810, 821 n.2 (W.D. Ky. 2022) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones."

[6] Plaintiff's arguments regarding Drs. Geci-Black and Odago appear to be aimed almost exclusively at establishing that those doctors were "treating physicians" who were required to provide only "summary disclosure[s] under Rule 26(a)(2)(C)" rather than "comprehensive written reports under Rule 26(a)(2)(B)." *See* [R. 90, pp. 4–6]. As explained above, however, a treating physician who is proposed as an expert but who is not required to provide a written report under Rule 26(a)(2)(B) must be timely disclosed as an expert. *See, e.g.*, *Ramsey*, 2025 WL 2577791, at *15; *Garrison*, 2018 WL 6566546, at *3; *McFerrin*, 29 F. Supp. 3d at 933. Here, Plaintiff's summary of Dr. Geci-Black's expected expert testimony came more than five months after his expert-disclosure deadline had passed, and he has not provided a summary of Dr. Odago's expected testimony at all. Plaintiff has thus failed to properly disclose either of these witnesses, regardless whether they were required to provide written reports under Rule 26(a)(2)(B).

(alteration omitted) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997))). The Court will thus grant ACH's request to exclude Dr. Geci-Black.

With respect to Dr. Odago, the minimal argument that Plaintiff offers is, for two principal reasons, wholly unpersuasive. First, the mere fact that Defendants had access to Plaintiff's medical records does not make Plaintiff's failure to disclose Dr. Odago harmless. Contrary to Plaintiff's suggestion, it is doubtful that Plaintiff's medical records were sufficient to make Defendants "aware" of Dr. Odago. *See* [R. 80, pp. 12:15–14:23 (indicating that Dr. Odago's name was mentioned only once in Plaintiff's medical records)]; *Ogle v. Koorsen Fire & Sec., Inc.*, 336 F. Supp. 3d 874, 877 (S.D. Ohio 2018) (emphasizing that Rule 26(a)(2)(C) "does 'not permit a Plaintiff to "dump" medical records on the defendant'" (quoting *Gleed v. AT&T Servs., Inc.*, No. 13-12479, 2016 WL 1451532, at *2 (E.D. Mich. Apr. 12, 2016))). But even if Defendants were "aware" of Dr. Odago as a potential witness, Plaintiff told Defendants at the outset of Dr. Odago's deposition that if "[Dr. Odago] turn[ed] out to be some type of a hybrid"—i.e., both a fact and expert witness—Plaintiff would "supplement [his] disclosures" accordingly. [R. 80, p. 14:1–10]. Plaintiff has not provided any kind of disclosure related to Dr. Odago's expected expert testimony, so ACH would understandably be "surprised" to learn that Plaintiff intends to elicit any such testimony. *See, e.g.*, *Ramsey*, 2025 WL 2577791, at *18 ("[E]ven if 'Defendant could not be surprised to find that Plaintiff's treating physicians were identified as potential expert witnesses,' it 'would likely be surprised to learn of these physicians' opinions at trial given Plaintiff's failure to provide the required summaries of such opinions as required by Rule 26(a)(2)(C).'" (quoting *West*, 2022 WL 1719676, at *11)); *Cosby v. Claiborne Cnty. Bd. of Educ.*, No. 17-CV-278, 2018 WL 3233336, at *3 (E.D. Tenn. July 2, 2018) (concluding that "Defendants' access to [Plaintiff's] medical records [did] not constitute harmlessness under Rule 37(c)" because

"[o]therwise, the requirement to provide a disclosure of Rule 26(a)(2)(C) would be eviscerated").

Second, Defendants' participation in Dr. Odago's deposition likewise fails to render Plaintiff's nondisclosure harmless. Courts have recognized that "the mere fact that witnesses may be available for deposition is insufficient to excuse noncompliance with Rule 26(a)(2) because 'obviating the need to provide Rule 26(a)(2) disclosures and reports by simply making experts available to be deposed would render the Rule meaningless.'" *Ogle*, 336 F. Supp. 3d at 877 n.2 (alterations omitted) (quoting *Kassim v. United Airlines, Inc.*, 320 F.R.D. 451, 454 (E.D. Mich. 2017)); *accord Sanford v. Russell*, No. 17-13062, 2019 WL 2051986, at *5 (E.D. Mich. May 9, 2019). Moreover, a plaintiff's failure to disclose a treating physician as an expert can "impair [a] defendant's ability to prepare for and conduct the treating physician's deposition." *Kassim*, 320 F.R.D. at 454 (citing *Rangel v. Anderson,* 202 F. Supp. 3d 1361, 1367 (S.D. Ga. 2016), *objections overruled*, No. CV-215-81, 2016 WL 6542717 (S.D. Ga. Nov. 3, 2016)). That is just what happened here. As Defendants made clear in their on-the-record objections to Dr. Odago's deposition, they had no information "concerning what Dr. Odago's role was in the treatment of [Plaintiff" or "of any opinions he was offering" and thus, no way to adequately prepare for the deposition. [R. 80, p. 9:11–15]. Accordingly, Defendants' participation in Dr. Odago's deposition could not cure the harm of Plaintiff's nondisclosure. *See, e.g.*, *Kassim*, 320 F.R.D. at 454; *Rangel*, 202 F. Supp. 3d at 1366–68. As such, the Court will grant ACH's request to exclude Dr. Odago.

In sum, because Plaintiff makes no arguments that his untimely disclosure of Dr. Geci-Black was either justified or harmless, the Court will grant ACH's Motion to Exclude Expert Testimony with respect to Dr. Geci-Black.[7] And because neither Defendants' access to Plaintiff's

---

[7] Even if the Court were to consider whether Plaintiff's untimely disclosure of Dr. Geci-Black was harmless, it would conclude that Plaintiff's failure was not harmless for reasons similar to those discussed above with respect to Dr. Odago. Specifically, Plaintiff's designation of Dr. Geci-Black as a potential fact witness provided Defendants with no notice that Plaintiff intended to call Dr. Geci-Black as an expert witness, *see, e.g.*, *Alexander*, 2019 WL 6736227,

medical records nor Defendants' participation in Dr. Odago's deposition rendered Plaintiff's nondisclosure harmless, the Court will grant ACH's Motion to Exclude Expert Testimony with respect to Dr. Odago. The Court next turns to Dr. McMunn, addressing each of the *Howe* factors, along with the parties' arguments, in turn.

The first *Howe* factor, surprise, weighs in favor of excluding Dr. McMunn's testimony. Plaintiff argues that "[t]here is no surprise here" because "[t]he substance of Dr. McMunn's opinions tracks the allegations that Defendants have long understood they must defend"—that "the nursing staff and medical providers failed to properly evaluate his condition, respond to sick call requests, and provide necessary medications." [R. 90, p. 7]. This Court squarely rejected just such an argument in *Coleman*, where the plaintiff asserted that the defendants could not have been surprised by her untimely disclosures because expert testimony was necessary to prove certain allegations in her complaint. *See Coleman*, 2023 WL 7132938, at *3–4. To borrow from the Court's persuasive reasoning in that case, "even if Defendants should have expected [Plaintiff] to disclose expert witnesses *at some point* in the case, [Plaintiff] does not explain why Defendants should have anticipated such disclosures to be made *almost four months*"—here, *over eight months*—"after [Plaintiff's] deadline for doing so had already expired." *See id.* at *3. As in *Coleman*, moreover, there is "no indication that Defendants knew, or could have known, what [Plaintiff's] expert witnesses would say, making the surprise to Defendants obvious." *See id.* (alteration omitted) (quoting *Abrams v. Nucor Steel Marion, Inc.*, 694 F. App'x 974, 982 (6th Cir. 2017)); *see also Counts v. Gen. Motors LLC*, No. 16-CV-12541, 2020 WL 6937937, at *14 (E.D. Mich. Nov. 25, 2020) ("[T]here is no reason to believe that Defendants should have expected

---

at *3; *Ramsey*, 2025 WL 2577791, at *15, and because Plaintiff disclosed Dr. Geci-Black as an expert and provided a written summary of his expected expert testimony only six days before his deposition, the deposition could not cure the harm of Plaintiff's untimely disclosure, *see Kassim*, 320 F.R.D. at 454; *Rangel*, 202 F. Supp. 3d at 1366–68.

Plaintiffs to disclose approximately eighty-five pages of new expert reports and opinions a month before the dispositive motion deadline." (alterations omitted) (quoting *Auto Club Grp. Ins. Co. v. Omega Flex, Inc.*, 2017 WL 3263355, at *3 (E.D. Mich. Aug. 1, 2017))). Given this "obvious" surprise, the first factor weighs plainly in favor of exclusion.

The second and third *Howe* factors—Defendants' ability to cure the surprise and the disruption of the trial proceedings—likewise weigh in favor of exclusion. Plaintiff argues that (1) the harm of his untimely disclosure "can be readily cured" because "Defendants [had] more than two months to review and respond to Dr. McMunn's opinions in their summary judgment briefing" and (2) "[t]o the extent additional discovery is needed, Plaintiff does not oppose the Court reopening discovery for the limited purpose of allowing Defendants to depose Dr. McMunn and, if necessary, designate a rebuttal expert." [R. 90, pp. 7–8]. Plaintiff further asserts that additional discovery would not be disruptive because "no trial date has been set." *Id.* at 8. Plaintiff's arguments are unpersuasive.

As to Plaintiff's first argument, Defendant's ability to respond to Dr. McMunn's opinions in their briefs simply is not a "cure" for their inability to "explore and challenge" his opinions through expert discovery. *See Garrison*, 2018 WL 6566546, at *3. Indeed, the very purpose of expert discovery is to "allow an opponent to examine an expert opinion for flaws and to develop counter-testimony through that party's own experts." *Askew v. City of Memphis*, No. 14-CV-2080, 2016 WL 4533587, at *5 (W.D. Tenn. Mar. 15, 2016) (quoting *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 598 (4th Cir. 2003)), *aff'd*, No. 14-CV-2080, 2016 WL 2757435 (W.D. Tenn. May 12, 2016). Plaintiff's untimely disclosure deprived Defendants of any opportunity to examine Dr. McMunn's opinions or to develop their own rebuttal evidence, and Defendant's ability to make arguments in their briefs is no cure. *See, e.g.*, *id.* (concluding that "the

ability to simply cross-examine an expert concerning a new opinion at trial is not the ability to cure" (quoting *S. States*, 318 F.3d at 592)).

As to Plaintiff's second argument, the time for additional discovery "has passed": "discovery has closed, [D]efendant[s] ha[ve] moved for summary judgment, and the briefing for that motion is complete," and "[t]herefore, it is too late for Plaintiff to cure his failure to comply with Rule 26(a)(2)." *Ramsey*, 2025 WL 2577791, at *19 (alterations omitted) (quoting *Force v. HL Motor Grp., Inc.*, No. 19-CV-12026, 2020 WL 13490038, at *4 (E.D. Mich. Aug. 20, 2020)). Moreover, although "the date for trial has not yet been set[,] . . . reopening discovery and resetting a dispositive motions deadline would delay [and thus disrupt] trial." *Wade v. United States*, No. 21-10552, 2022 WL 19001837, at *3 (E.D. Mich. Dec. 19, 2022) (citing *Dobbins v. Greyhound Lines, Inc.*, 336 F.R.D. 144, 148 (E.D. Mich. 2020)); *accord Coleman*, 2023 WL 7132938, at *4. Finally, Plaintiff states that he "does not oppose the Court reopening discovery," [R. 90, pp. 7–8], but he has not moved to extend the deadlines for either discovery or dispositive motions. *See, e.g.*, *Wade*, 2022 WL 19001837, at *3; *Ramsey*, 2025 WL 2577791, at *19. For those reasons, the second and third *Howe* factors weigh in favor of exclusion.

The fourth *Howe* factor, the importance of Dr. McMunn's testimony, is neutral. Plaintiff argues that "[t]he importance of Dr. McMunn's testimony cannot be overstated" because "medical negligence claims under Kentucky law require expert testimony to establish the applicable standard of care and any breach thereof." [R. 90, p. 8]. Plaintiff fails to appreciate, however, that such importance "cuts both ways"—"the more important the proof, the greater the effect of preclusion, but also the greater the harm in tardy disclosure." *Ramsey*, 2025 WL 2577791, at *19 (quoting *EQT Prod. Co. v. Magnum Hunter Prod., Inc.*, No. 16-CV-150, 2017 WL 2295906, at *5 (E.D. Ky. May 25, 2017), *objections overruled*, No. 16-CV-150, 2017 WL 4974782 (E.D. Ky.

July 19, 2017)). Given that Dr. McMunn is Plaintiff's only expert witness who is expected to testify to the relevant standard of care and to Defendants' alleged breaches—and that such an expert is required under Kentucky law, *see infra*—Plaintiff's disclosure of Dr. McMunn more than eight months after his expert-disclosure deadline had passed is inexplicable and inexcusable. *See, e.g.*, *EQT Prod.*, 2017 WL 2295906, at *5 ("The fourth factor . . . must be viewed from the perspective of both parties, and the fact that certain evidence is helpful to a party's case in the eyes of the jury also shows why it should have been disclosed in a timely manner." (quoting *Exclaim Mktg., LLC v. DirecTV, LLC*, No. 11-CV-684, 2014 WL 12626359, at *3 (E.D.N.C. Nov. 18, 2014))). Moreover, even if the Court were to conclude that this factor favors Plaintiff, "importance cannot, by itself, save improperly disclosed evidence from being found unjustified or non-harmless." *Ramsey*, 2025 WL 2577791, at *19 (quoting *EQT Prod.*, 2017 WL 2295906, at *5); *accord Coleman*, 2023 WL 7132938, at *4. Accordingly, the Court finds that this factor "cuts both ways" and is neutral. *See, e.g.*, *Ramsey*, 2025 WL 2577791, at *19; *EQT Prod.*, 2017 WL 2295906, at *5; *Coleman*, 2023 WL 7132938, at *4.

The fifth and final factor, Plaintiff's explanation for his failure to timely disclose, favors exclusion. Plaintiff asserts that his failure was "not the product of bad faith or gamesmanship" and that, instead, Dr. McMunn was "delayed in preparing his written report" due to "[Plaintiff's] inability to obtain necessary testimony from ACH and its employees," namely, Nurses White and Glass. [R. 90, pp. 8–9]. As ACH notes in its reply, however, Dr. McMunn's report was completed on September 10, 2025, and Nurses White and Glass were not deposed until September 24. [R. 94, p. 9]; *see* [R. 86, p. 3]; [R. 90, p. 8]; [R. 77]. In other words, their testimony was not "necessary" to Dr. McMunn's report, *cf.* [R. 90, pp. 8–9], and the Court thus "cannot see how the timing of [the depositions] caused [Plaintiff] to miss [his] expert disclosure deadline," *see Coleman*, 2023

WL 7132938, at *4. Moreover, even if the testimony of the ACH employees had been necessary to Dr. McMunn's opinions, Plaintiff offers no explanation for "why [he] could not have timely disclosed [his] experts and, if necessary, supplemented the disclosures thereafter in accordance with Rule 26[(a)(2)(E), (e)]." *See id.* For those reasons—and especially given the importance of Dr. McMunn's testimony to Plaintiff's medical negligence claims—the Court finds Plaintiff's explanation for his untimely disclosure wholly unsatisfactory. *See id.*; *Etheridge v. E. I. DuPont De Nemours & Co.*, No. 14-CV-2443, 2015 WL 12516227, at *3 (W.D. Tenn. Oct. 14, 2015) ("[B]ecause this evidence is so important to Plaintiff, her explanation for her failure to abide by the Court's Order or the Federal Rules of Civil Procedure becomes even less satisfactory.").

In sum, four of the five *Howe* factors weigh against Plaintiff, and the remaining factor is neutral. Put simply, Plaintiff has offered no compelling arguments that his failure to timely disclose Dr. McMunn as an expert was either substantially justified or harmless. Because "[t]he exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless," *Clark*, 2023 WL 2316205, at *2 (quoting *Dickenson*, 388 F.3d at 983), the Court will grant ACH's Motion to Exclude Expert Testimony with respect to Dr. McMunn.

**B. The Motions for Summary Judgment, [R. 85], [R. 87]**

As noted above, Plaintiff asserts a § 1983 deliberate indifference claim and a § 1983 conspiracy claim against the Bell County Defendants and ACH, but he asserts his negligence and gross negligence claims against only ACH. [R. 1, ¶¶ 48–108.]. The Court considers ACH's Motion for Summary Judgment with respect to Plaintiff's state-law claims of medical negligence and gross negligence, [R. 87, pp. 6–12], before turning to the § 1983 claims.

**1. Plaintiff's Claims for Negligence (Count I) and Gross Negligence (Count II) Against ACH**

As to Plaintiff's state-law claims of medical negligence and gross negligence, ACH argues, among other things, that Plaintiff cannot establish essential elements of medical negligence without expert testimony and that "if [the] Court grants ACH's motion to exclude, Plaintiff will be unable to present any expert testimony necessary to prove his medical negligence and gross negligence claims." [R. 87, pp. 10–12]; *accord* [R. 96, pp. 12–13]. Plaintiff, in response, does not dispute that expert testimony is necessary to establish medical negligence; instead, he argues only that the evidence provided by his proposed medical experts—Drs. Geci-Black, Odago, and McMunn—is sufficient.[8] *See* [R. 89, pp. 7–8, 10]. The Court agrees with ACH and, having granted ACH's Motion to Exclude Expert Testimony, the Court will grant ACH's Motion for Summary Judgment with respect to Plaintiff's medical negligence claims.[9]

Under Kentucky law,[10] "[m]edical negligence requires proof of the following elements: (1) a duty of care; (2) a breach of that duty; (3) actual injury; and (4) that the injury was proximately caused by the negligence." *Stewart v. Hensley*, No. 20-CV-008, 2023 WL 12091143, at *15 (E.D. Ky. Jan. 13, 2023) (citing *Grubbs ex rel. Grubbs v. Barbourville Fam. Health Ctr., P.S.C.*,

---

[8] In a single sentence at the end of his reply brief, Plaintiff asserts that "even without retained expert testimony, [his] treating physicians have provided opinions establishing causation sufficient to satisfy Federal Rule of Evidence 702." [R. 89, p. 10]. To the extent that Plaintiff intends this assertion to serve as a "backup" argument in case ACH's Motion to Exclude Expert Testimony is granted, Plaintiff is misguided. The Court has, in granting ACH's motion, excluded Plaintiff's proposed medical experts—retained or otherwise—in full. *See supra* Section III(A). Accordingly, Plaintiff's treating physicians, Drs. Geci-Black and Odago, could testify, at most, as fact witnesses, but they could not provide expert opinion on matters such as causation. *Randle v. United States*, No. 23-CV-12430, 2026 WL 1196251, at *5 n.3 (E.D. Mich. Mar. 31, 2026) (quoting *Kassim*, 320 F.R.D. at 455); *accord Wolff v. Maybach Int'l Grp., Inc.*, No. 19-CV-149, 2023 WL 5493529, at *1 (E.D. Ky. Aug. 24, 2023). Plaintiff thus makes no argument that his non-expert evidence alone could establish the elements of his medical negligence claims. *See* [R. 89, pp. 7–8, 10].

[9] Because the Court will grant summary judgment on these claims based on Plaintiff's lack of expert medical evidence, the Court need not address ACH's alternative arguments related to these claims.

[10] Kentucky law governs the substance of Plaintiff's state-law medical negligence claims. *See, e.g.*, *Bressler v. Lusk*, No. 22-CV-35, 2024 WL 4357554, at *14 n.15 (E.D. Ky. Sep. 30, 2024) (citing *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999)).

120 S.W.3d 682, 687–88 (Ky. 2003)). The Supreme Court of Kentucky recently reiterated that "a plaintiff bringing a typical medical malpractice case is required by law to put forth expert testimony to inform the jury of the applicable medical standard of care, any breach of that standard and the resulting injury." *Diagnostic X-Ray Physicians, PSC v. Lloyd*, No. 2024-SC-0216-DG, --- S.W.3d ---, 2026 WL 1839842, at *7 (Ky. June 25, 2026) (quoting *Blankenship v. Collier*, 302 S.W.3d 665, 675 (Ky. 2010)); *see also, e.g.*, *Phillips v. Tangilag*, 14 F.4th 524, 540 (6th Cir. 2021) ("Kentucky courts generally require patients to introduce expert medical evidence to establish the breach and causation elements of [a medical] negligence claim.").

A limited exception to this requirement applies for cases in which "any layman is competent to pass judgment and conclude from common experience that such things [i.e., the plaintiff's injuries] do not happen if there has been proper skill and care." *Lloyd*, 2026 WL 1839842, at *10 (quoting *Perkins v. Hausladen*, 828 S.W.2d 652, 655 (Ky. 1992)). However, Plaintiff does not argue that this exception applies, and he appears to concede that it does not. [R. 90, p. 8 (arguing that "[t]he importance of Dr. McMunn's testimony cannot be overstated" because "medical negligence claims under Kentucky law require expert testimony to establish the applicable standard of care and any breach thereof")]. Moreover, on the record, that exception is plainly inapplicable here: Whether ACH's employees violated any standard of care and whether any such violation caused Plaintiff's injuries are questions well beyond the knowledge of the typical layperson. *See generally Mantell v. Health Pros. Ltd.*, No. 11-CV-1034, 2013 WL 5442357, at *12 (N.D. Ohio Sep. 27, 2013) (concluding that the standard of care for a medical screening at a jail is "well beyond" lay knowledge), *aff'd*, 612 F. App'x 302 (6th Cir. 2015); *Stanley v. Wilson County*, No. 03-0284, 2007 WL 2471693, at *3 (M.D. Tenn. Aug. 24, 2007) ("[I]t can hardly be said that the proper method of responding to someone who is undergoing acute

alcohol withdrawal or is experiencing delirium tremens is within the common knowledge of laymen."); *Dennison v. Hardin Cnty. Det. Ctr.*, No. 14-CV-378, 2016 WL 742933, at *9 (W.D. Ky. Feb. 24, 2016) ("[T]he issue of medication choice is nearly always an issue of medical judgment[] and therefore beyond the everyday knowledge of laypersons."). Thus, Plaintiff cannot succeed on his claims of medical negligence without expert testimony.

Because Plaintiff cannot establish medical negligence without expert evidence and because the Court has excluded each of Plaintiff's proposed medical experts, the Court will grant ACH's Motion for Summary Judgment with respect to Plaintiff's claims of medical negligence (Count I) and gross negligence (Count II). *See, e.g.*, *May v. Akers*, No. 21-CV-182, 2023 WL 3019667, at *7 (E.D. Ky. Apr. 20, 2023); *Romines v. Walkup*, No. 08-CV-179, 2010 WL 411475, at *4 (W.D. Ky. Jan. 29, 2010); *Miller v. Love*, No. 06-CV-154, 2008 WL 11342676, at *2 (E.D. Ky. Sept. 11, 2008).

Having disposed of the state law claims against ACH, the only remaining claims are Plaintiff's § 1983 deliberate indifference claim (Count III) and Plaintiff's civil conspiracy claim (Count IV). Plaintiff brings each of these claims against the Bell County Defendants as well as ACH. The Court first considers the § 1983 claim against the individual Bell County Defendants (both in their individual and official capacities) before turning to the Bell County Fiscal Court and ACH, and before considering the civil conspiracy claim.

**2. Plaintiff's § 1983 Deliberate Indifference Claim (Count III) Against the Individual Officers in their Individual Capacities**

In his complaint, Plaintiff alleges that each of the officer defendants, in their individual capacities, is liable under Count III, the § 1983 claim, for showing deliberate indifference to his serious medical needs in violation of his constitutional rights. [R. 1, ¶¶ 69–98]. To prevail on this § 1983 claim, the plaintiff must prove "(1) the deprivation of a right secured by the Constitution

or laws of the United States (2) caused by a person acting under the color of state law." *North v. Cuyahoga Cnty.*, 754 F. App'x 380, 384 (6th Cir. 2018) (quoting *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 736 (6th Cir. 2015)) (internal quotation marks omitted). The second of these requirements is uncontested in this case. *See generally* [R. 85-2]; [R. 87]. At issue, however, is whether these defendants violated Plaintiff's constitutional rights. To resolve this issue, the Court first turns to the Bell County Defendants' argument that the individual officers are entitled to qualified immunity to the extent they are sued in their individual capacities. *See* [R. 85-2, pp. 23–26].

The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 601–02 (6th Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (internal quotation marks omitted). To evaluate a qualified immunity defense, the Court considers two questions:

> First, the court considers whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the officer's conduct violated a constitutional right. If the facts alleged fail to establish a constitutional violation, then the inquiry ends and the officer is entitled to qualified immunity. If, however, the facts alleged are sufficient to establish a constitutional violation, then the Court must determine whether the particular right allegedly violated was clearly established at the time the violation occurred.

*Id.* at 602 (internal citations omitted).

Thus, in considering the individual Bell County Defendants' qualified immunity argument, the Court must first determine if the facts, when viewed in the light most favorable to Plaintiff, demonstrate that individual officers violated Plaintiff's constitutional rights.

**a. The Appropriate Test and the Bell County Defendant's Request for Further Briefing**

As an initial matter, the Court clarifies which constitutional rights are at issue. In his complaint, Plaintiff cites both the Eighth Amendment and the Fourteenth Amendment. [R. 1, ¶¶ 70–98]. The Eighth Amendment prohibits prison officials from "unnecessarily and wantonly inflicting pain" on an inmate by acting with "deliberate indifference" toward the inmate's serious medical needs. *See Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estell v. Gamble*, 429 U.S. 97, 104 (1976)). Pretrial detainees are afforded the same protections under the Fourteenth Amendment. *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 545 (1979)); *Revere*, 463 U.S. at 244; *see also Hehrer v. Cnty. of Clinton*, 161 F.4th 955, 962 (6th Cir. 2025) ("While the Eighth Amendment's ban on 'cruel and unusual punishments' protects convicted prisoners, the Fourteenth Amendment's ban on 'depriv[ations]' of 'life' or 'liberty' 'without due process of law' protects pretrial detainees." (citations omitted)).

In this case, there appears to be some dispute between Plaintiff and the Bell County Defendants as to whether Plaintiff, who was arrested and detained on a probation violation, was a pretrial detainee. *See* [R. 1, ¶ 70]; [R. 85-2, p. 18]. However, courts within this circuit have concluded that such individuals are considered pretrial detainees for purposes of a § 1983 analysis. *See Craddock v. County of Macomb*, 718 F. Supp. 3d 683, 693 (E.D. Mich. 2024); *Bond v. Moore*, 672 F. Supp. 3d 357, 368–70 (E.D. Ky. 2023); *Jones v. Kenton County, Kentucky*, No. CV 2:23-164-DCR, 2024 WL 1705210, at *3–4 (E.D. Ky. Apr. 19, 2024); *see also Craddock v. Wellpath, LLC*, No. 24-1536, 2025 WL 278577, at *3 (6th Cir. Jan. 23, 2025) (considering inmate's deliberate indifference claim under the Fourteenth Amendment when he had been detained for a probation violation). As such, in the present case, the Court finds that the relevant constitutional provision is the Fourteenth Amendment.

For many years, this "distinction between pretrial detainees and convicted prisoners did not matter." *Hehrer*, 161 F.4th at 963. That is, a pretrial detainee's Fourteenth Amendment deliberate indifference claim was analyzed "under the same framework for deliberate-indifference claims brought by prisoners pursuant to the Eighth Amendment, including claims of inadequate medical care." *Martin v. Warren Cnty.*, 799 F. App'x 329, 337 (6th Cir. 2020) (citation omitted); *see also Helphenstine v. Lewis Cnty.*, 60 F. 4th 305, 315 (6th Cir. 2023) ("Until recently, we analyzed both pretrial detainees' and prisoners' claims of deliberate indifference 'under the same rubric.'" (quoting *Brawner v. Scott Cnty.*, 14 F.4th 585, 591 (6th Cir. 2021))). Under this older test, a prison official's deliberate indifference violates a pretrial detainee's constitutional rights when the official intentionally denies or delays access to medical care for a serious medical need. *Blackmore*, 390 F.3d at 895 (citing *Estelle*, 429 U.S. at 104). This test, in turn, has both an objective and subjective component. *Id.* (citations omitted). The objective component requires the plaintiff to show an objectively serious medical need. *Id.* And, as articulated in *Farmer v. Brennan*, 511 U.S. 825 (1994), the subjective component requires that (1) the individual defendant subjectively perceived facts from which to infer a substantial risk to the detainee; (2) he or she did in fact draw that inference; and (3) he or she then disregarded that risk. *Id.* at 837; *see also Jackson v. Wilkins*, 517 F. App'x 311, 317 (6th Cir. 2013) (citation omitted).

As noted, for many years, this test applied to both a convicted prisoner's Eighth Amendment deliberate indifference claim, as well as a pretrial detainee's Fourteenth Amendment deliberate indifference claim. However, in *Brawner v. Scott County*, 14 F.4th 585 (6th Cir. 2021), the Sixth Circuit amended this test for pretrial detainees. Specifically, the Sixth Circuit "lower[ed] the subjective component from actual knowledge to recklessness." *Helphenstine*, 60 F.4th at 316; *see also Hehrer*, 161 F.4th at 963 ("[W]e adopted an easier-to-meet subjective element for pretrial

detainees under the Fourteenth Amendment" in *Brawner*. (citation omitted)). To satisfy this modified subjective element, a pretrial detainee was required to prove that a defendant "acted deliberately (not accidentally), but also recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Brawner*, 14 F.4th at 596 (quoting *Farmer*, 511 U.S. at 836). In other words, "[a] pretrial detainee [was required to] prove 'more than negligence but less than subjective intent—something akin to reckless disregard.'" *Id.* (quoting *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)).

The change "announced in *Brawner* spawned a host of related developments" in the Sixth Circuit. *Poynter by and through Fernandez v. Shirley*, -- F.4th --, 2026 WL 2641092, at *1 (6th Cir. 2026) (en banc). Indeed, "post-*Brawner* jurisprudence has not followed a straight line." *Id.* at *4. Recently, after briefing in this case concluded, the Sixth Circuit, en banc, considered this post-*Brawner* jurisprudence in *Poynter* and ultimately concluded that "*Farmer*'s deliberate-indifference standard remains the proper measure for evaluating conditions-of-confinement claims." *Id.* at *6. While *Poynter* involved a failure-to-protect deliberate indifference claim, the Sixth Circuit made clear that "*Farmer v. Brennan*'s subjective standard properly governs deliberate-indifference cases brought under the Fourteenth Amendment." *Id.* at *16; *see also id.* at *8 (discussing *Farmer* and stating that "[w]e return to that familiar standard today").

As a result of the Sixth Circuit's shift in *Poynter*, the Bell County Defendants filed their Motion to Allow Additional Briefing on Summary Judgment, [R. 102]. They seek a telephonic status conference to discuss the impact of *Poynter* and whether additional briefing is warranted, noting that "the parties have fully briefed[] the issue of Summary Judgment under the now overruled *Brawner* standard." *See id.* at 2. The Court finds that no further briefing is necessary, however. First, while the Bell County Defendants did address the easier-to-meet *Brawner* standard

in their motion, they also addressed the *Farmer* test. [R. 85-2, pp. 18–23]. Indeed, the Bell County Defendants argued that "Plaintiff cannot sustain his claims under *either* an Eighth Amendment or Fourteenth Amendment analysis." *Id.* at 18 (emphasis added); *see also id.* at 23 ("[T]here was no showing of deliberate indifference or reckless disregard as required by the tests that govern both the treatment of convicted prisoners and pretrial detainees.").

Plaintiff likewise alleged in his complaint that it was unclear which standard applied (due to Plaintiff being detained on a probation violation), and he therefore asserted claims arising under *either* the Eighth Amendment or the Fourteenth Amendment and made specific allegations to address each test. *See, e.g.*, [R. 1, ¶¶ 69–98]. Given these allegations, and the parties' ongoing dispute as to whether Plaintiff qualified as a pretrial detainee, the Court has no reason to believe that the parties failed to adequately explore these matters in discovery, or that any additional discovery on this issue is necessary. Stated another way, Plaintiff acknowledged from the start that the *Farmer* standard might apply to this case, and he therefore had an adequate opportunity in discovery to explore facts and develop evidence applicable to that standard.

To the extent Plaintiff's response brief describes Plaintiff as a pretrial detainee and argues (for the first time) only for application of the *Brawner* standard, *see* [R. 88, p. 6], the Court nevertheless finds additional briefing unnecessary. Plaintiff (and the defendants) addressed the "easier-to-meet" test, and the Court likewise addresses that test herein. *See generally Hehrer*, 161 F.4th at 963 ("[W]e adopted an easier-to-meet subjective element for pretrial detainees under the Fourteenth Amendment [in *Brawner*.]" (citation omitted)). Moreover, in his response to ACH, Plaintiff *does* argue that "Plaintiff satisfies either test." [R. 89, p. 8]. Regardless, for the reasons explained herein, Plaintiff's § 1983 deliberate indifference claim against the officers in their individual capacities cannot survive this easier-to-meet test, and he therefore cannot satisfy the

more-difficult-to-meet *Farmer* test. As such, the Court needs no further briefing on the *Farmer* test, and it will deny as moot the Bell County Defendant's Motion to Allow Additional Briefing on Summary Judgment, [R. 102].

**b. Application of the Tests**

Accordingly, to determine if the defendants were deliberately indifferent to Plaintiff's serious medical needs in violation of his Fourteenth Amendment rights, the Court first considers the easier-to-meet *Brawner* standard, that is, (1) whether Plaintiff had a sufficiently serious medical need; (2) whether each defendant's action (or lack of action) was intentional (i.e., not accidental), and that defendant either intentionally ignored Plaintiff's serious medical need, or "recklessly failed to act reasonably to mitigate the risk the serious medical need posed to [Plaintiff], even though a reasonable official in [that defendant's] position would have known that the serious medical need posed an excessive risk to [Plaintiff's] health or safety." *Brawner*, 14 F.4th at 597. However, for the reasons explained below, the Court finds that Plaintiff cannot satisfy the subjective element of this test, and as a result, it need not consider the objective prong. *See Craddock v. Wellpath, LLC*, 2025 WL 278577, at *3 (citing *Downard ex rel. Downard v. Martin*, 968 F.3d 594, 600 (6th Cir. 2020)).

When examining *Brawner*'s "easier-to-meet subjective element," *Hehrer*, 161 F.4th at 963, the "key question" can be framed as follows: Did the defendant officers "act 'recklessly in the face of an unjustifiably high risk' that is either 'known or so obvious that it should be known?'" *Britt v. Hamilton Cnty.*, No. 21-3424, 2022 WL 405847, at *2 (6th Cir. Feb. 10, 2022) (quoting *Brawner*, 14 F.4th at 596–97). The Sixth Circuit has explained "that this test requires more than mere negligence." *Hehrer*, 161 F.4th at 964 (citing *Brawner*, 14 F.4th 596). The Sixth Circuit has further elaborated on the difference between negligence and recklessness, turning to common-law

principles:

> According to common-law sources, the difference turns on the size of the risk of harm. For recklessness, the risk must be "substantially greater than that which is necessary to make [a defendant's] conduct negligent." Restatement (Second) of Torts § 500 (A.L.I. 1965); *see Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68–69, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007). That is, the "difference" in the risk must be "so marked as to amount substantially to a difference in kind" rather than degree. Restatement (Second) of Torts § 500 cmt. g. Put differently, it must be "highly probable" that the risk would materialize and cause harm. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 34, at 213 (5th ed. 1984).

*Hehrer*, 161 F.4th at 964.

When such a risk exists, a plaintiff must then show that the defendants "responded unreasonably" to the risk. *Id.* (quoting *Campbell v. Riahi*, 109 F.4th 854, 860 (6th Cir. 2024)). As for corrections officers responding to an inmate's medical needs, the Sixth Circuit has acknowledged that they "lack medical expertise," and as such, "they typically act reasonably by referring an inmate's health concerns to medical personnel." *Id.* (citations omitted). And "once inmates begin to receive care from a medical professional, officers typically act reasonably by following the 'medical professional's diagnosis or treatment.'" *Id.* (quoting *Grote*, 85 F.4th at 412). To be clear, however, the "general principle that it is often sufficient for a jailer to contact a medical professional when they perceive a medical issue" applies "when a jailer contemporaneously contacts a medical professional who can provide *near-immediate* treatment." *Helphenstine*, 60 F.4th at 318 (emphasis in original). "Indeed," the Sixth Circuit has explained, "as little as a one-hour delay in treatment could be enough for a jury to conclude that a jailer was indifferent to an inmate's medical needs." *Id.* (citing *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 845 (6th Cir. 2002).

In considering this subjective component, the Court must "analyze each defendant individually." *Greene v. Crawford Cnty.*, 22 F.4th 593, 608 (6th Cir. 2022) Accordingly, for each

individual Bell County Defendant, the Court asks whether that defendant "act[ed] 'recklessly in the face of an unjustifiably high risk' that [was] either 'known or so obvious that it should [have been] known.'" *Britt*, 2022 WL 405847, at *2 (quoting *Brawner*, 14 F.4th at 596–97).

**i. Gary Ferguson**

During the relevant time frame, Ferguson was the jailer of Bell County, Kentucky. *See* [R. 81, p. 11:14–24 (Ferguson Depo.)]. Plaintiff testified that he never saw Ferguson during his time at the detention center in 2022. [R. 72, p. 75:2–8 (Howard Depo.)]. And Ferguson did not testify about any interactions with Plaintiff between December 13, 2022 and December 29, 2022. *See generally* [R. 81]. Plaintiff's complaint is likewise devoid of any allegations that Ferguson observed or interacted with Plaintiff in any way, or was aware of any medical concerns relating to Plaintiff, during the relevant time frame. *See generally* [R. 1]. The Bell County Defendants point to this lack of evidence and allegations in their Motion for Summary Judgment. *See, e.g.*, [R. 85-2, pp. 12, 31]. Plaintiff, in response, provides no argument whatsoever that Ferguson was deliberately indifferent to his serious medical needs. *See generally* [R. 88]. The Court therefore understands that, to the extent Plaintiff initially intended to bring a § 1983 deliberate indifference claim against Ferguson, he has abandoned any such claim. *See Buckner v. JPMorgan Chase Bank, N.A.*, No. 4:23-cv-123, 2025 WL 1707302, at *3 (W.D. Ky. June 18, 2025) ("[T]he Sixth Circuit's jurisprudence on abandonment of claims in response to summary judgment is also clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." (citations omitted)). Regardless, on the current record, summary judgment is warranted given the lack of contact between Ferguson and Plaintiff during the relevant time period. *See Burnette v. Whitley County, Kentucky*, 828 F.Supp.3d 767, 803–04 (E.D. Ky. 2026) (granting summary judgment in favor of a jailer that had limited contact with the plaintiff

and had no reason to know of the seriousness of the plaintiff's medical condition).

The Court will therefore grant summary judgment on the § 1983 deliberate indifference claim (Count III) asserted against Ferguson in his individual capacity.[11] *See Estate of Owensby*, 414 F.3d at 602 (explaining that, when "the facts alleged fail to establish a constitutional violation, then the inquiry ends and the officer[s] [are] entitled to qualified immunity").

**ii. Joshua Collett**

During the relevant time frame, Joshua Collett served as the head deputy jailer at the Bell County Detention Center. *See* [R. 82, p. 12:2–4 (Collett Depo.)]. Plaintiff testified that he saw Collett at some point during his time at the detention center in 2022, but he provided no further details about any interaction with Collett during the relevant time frame. [R. 72, p. 75:2–13 (Howard Depo.)]. Collett testified that he did not recall anything about Plaintiff being at the detention center in December 2022, and he typically stayed on the first floor and "didn't really go upstairs to deal with inmates." [R. 82, p. 12:12–19]. Plaintiff's complaint is likewise devoid of any allegations that Collett observed or interacted with Plaintiff in any way during the relevant time frame. *See generally* [R. 1]. The Bell County Defendants point again to this lack of evidence and allegations in their Motion for Summary Judgment. *See, e.g.*, [R. 85-2, pp. 12, 23, 31]. Plaintiff, in response, provides no argument whatsoever that Collett was deliberately indifferent to his serious medical needs. *See generally* [R. 88]. The Court therefore understands that, to the extent

[11] Plaintiff's complaint contains allegations that might be relevant to a supervisory liability claim. [R. 1, ¶¶ 76–77, 89–90]. The Bell County Defendants briefly address such allegations in their motion, [R. 85-2, pp. 4, 26–27], but Plaintiff makes no mention of any supervisory liability theory of relief in his response. *See* [R. 88]. The Court therefore understands that Plaintiff never intended to bring such a claim or has otherwise abandoned that theory. Moreover, based on the record before the Court, it does not appear that Plaintiff could succeed on such a claim or theory, against any of the named defendants. *See Burnette*, 828 F.Supp.3d at 812–1 (granting summary judgment with respect to the plaintiff's supervisory liability claims); *Helphenstine*, 60 F.4th at 321 (explaining that, to bring a supervisory-liability claim, a plaintiff "must show that [the defendant-supervisor] was actively involved in offensive conduct and that his conduct caused [the plaintiff's] injuries" (citation omitted)).

Plaintiff initially intended to bring a § 1983 deliberate indifference claim against Collett, he has abandoned any such claim. *See Buckner*, 2025 WL 1707302, at *3. Regardless, on the current record, summary judgment is warranted given the lack of contact between Collett and Plaintiff during the relevant time period. *See Burnette*, 828 F.Supp.3d at 803–04 (E.D. Ky. 2026).

The Court will therefore grant summary judgment on the § 1983 deliberate indifference claim (Count III) asserted against Collett in his individual capacity. *See Estate of Owensby*, 414 F.3d at 602 (explaining that, when "the facts alleged fail to establish a constitutional violation, then the inquiry ends and the officer[s] [are] entitled to qualified immunity").

**iii. Brandi Osborne**

As to this defendant, Plaintiff's allegations are limited. He argues only that "when he asked Defendant Brandy (sic) Osborne for medical attention, she laughed at him and used an expletive." [R. 88, p. 6]. Plaintiff argues that, if this is true, it "evidences deliberate indifference to [Plaintiff's] request for medical care." *Id.* at 6–7. From the best the Court can tell, Plaintiff—in no more than two sentences—argues that Osborne declined his request for medical care, and this constitutes deliberate indifference to his serious medical needs. But he provides no further argument or evidence, and he fails to cite any authority in support of this position. Simply put, his arguments regarding Osborne are wholly undeveloped, and the Court need not consider them further. *See, e.g., Members Heritage Credit Union v. New York Marine & General Ins. Co.*, No. 5:21-CV-207-CHB, 2023 WL 4876383, at *13 (E.D. Ky. July 31, 2023) (explaining that the plaintiff's argument was "wholly undeveloped and the Court need not consider it" (citations omitted)).

Moreover, the Court is not obligated to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). Nevertheless, the Court has reviewed the evidence of record and concludes that, even assuming that Osborne

used an expletive in response to Plaintiff's request for a sick call form or refused to provide a sick call request form (or otherwise contact medical personnel), no reasonable jury could conclude that Osborne was deliberately indifferent to a serious medical need. The Court briefly reviews the relevant evidence of record.

During the relevant time frame, Osborne was a correctional officer at Bell County Detention Center. *See* [R. 73, p. 9:9–12 (Osborne Depo.)]. In the summer of 2022, she underwent training to assist with medical duties, e.g., dispensing (or "pulling" and "passing") medications. *Id.* at 10:24–25, 11:1–11. By December 2022, she served as a "medical staff person," meaning a jail officer on "medical duty" that handed out medications, among other things. *Id.*; *see also* [R. 76, pp. 21:6–25, 22:1–9 (Cox Depo.)]. Osborne testified that, in this role, she did not contact the ACH nursing staff in response to an inmate's medical questionnaire; she "just pulled and passed" medications. [R. 73, p. 16:10–22]. She did not speak to ACH nursing staff "about directives for inmates," and at no point in December 2022 did she talk to Jessica Glass, the on-duty nurse practitioner. *Id.* at 16:23–25, 17:1–3.

Regarding Plaintiff, Osborne only "vaguely" recalled his time at Bell County Detention Center in December 2022. *Id.* at 17:8–10. She recalled that he "came in," and she thought other corrections offers and Lozano "said he might have been withdrawing" from suboxone. *Id.* at 17:11–19. Osborne testified that she passed Plaintiff his medications on multiple occasions, as recorded in the MAR report. *Id.* at 21:2–25, 22:1–11. She also testified that, based on her personal observations of Plaintiff during these interactions, it did not appear that his condition changed between December 16, 2026 and December 29, 2026, and he did not appear sick. *Id.* at 22:10–21. When asked if Plaintiff appeared to be exhibiting any symptoms of someone withdrawing "from substances," she responded in the negative. *Id.* at 22:22–25. Osborne further testified that Plaintiff

never requested Klonopin or Suboxone from her; she did not review his chart or his medications; she did not pull prescription lists from pharmacies; and she never saw a pharmacy-provided medication list. *Id.* at 19:24–25, 20:1–19. She also testified that she did not take Plaintiff's vital signs, and instead, male guards were responsible for doing so. *Id.* at 27–23:25.

Osborne also recalled "a few times when [she] passed his meds to him at night, [Plaintiff] would ask for sick calls and [she would] take him to the med room for Robert [Lozano]." *Id.* at 17:20–24. She testified that he asked for sick call forms every day that he was at Bell County Detention Center, and in response, he would be given a sick call form to fill out, either from her or a male guard, and the form would then "go into the med room for Robert Lozano the next day to where he can get ahold of Jessica Glass and see if there's any meds he needed to add or take away." *Id.* at 18:13–25, 19:1–9; *see also id.* at 23:1–2. Plaintiff, on the other hand, testified that he requested a sick call form or assistance fifteen to twenty times, and he received "an actual form maybe four times." [R. 72, p. 133:3–24].

On these facts, no reasonable jury could find that Osborne was deliberately indifferent to a serious medical need. Osborne may have been informed that Plaintiff "might have been withdrawing" from Suboxone, [R. 73, p. 17:11–19]; however, "that knowledge *alone* did not require [her] to seek medical care for [Plaintiff], particularly since withdrawal 'typically may be managed in a prison setting and indeed frequently is managed there.'" *Helphenstine*, 60 F.4th at 321 (quoting *Speers*, 196 F. App'x at 396) (emphasis added). Moreover, Plaintiff had been placed on a detox protocol to mitigate his withdrawal from Suboxone. *See* [R. 81, pp. 59:9–25, 60:1–3 (Ferguson Depo.)]; [R. 85-5 (MAR)]. And importantly, there is no indication (or argument) that Osborne knew or had reason to know that Plaintiff was also detoxing from a *benzodiazepine*. Indeed, Osborne did not personally observe Plaintiff appearing sick or exhibiting *any* symptoms

of withdrawal (from any substance) and she did not notice any change in his condition between December 13, 2026 and December 29, 2026. *Id.* at 22:10–25. And even assuming Osborne failed to give Plaintiff a sick call form (or contact medical personnel) when Plaintiff made such a request, that fact alone does not indicate that she was deliberately indifferent to a serious medical need. Instead, Plaintiff must prove that a defendant acted recklessly in the face of an unjustifiably high risk of harm that was either known or so obvious that it should have been known. But here, Plaintiff fails to cite any record evidence indicating that Osborne knew, or had reason to know, of any risk to Plaintiff's health, much less an unjustifiably high or substantial risk, given that he did not exhibit any outward signs of illness or withdrawal (from any substance). As such, his § 1983 deliberate indifference claim against Osborne must fail.[12]

The Court will therefore grant summary judgment on the § 1983 deliberate indifference claim (Count III) asserted against Osborne in her individual capacity. *See Estate of Owensby*, 414 F.3d at 602 (explaining that, when "the facts alleged fail to establish a constitutional violation, then the inquiry ends and the officer[s] [are] entitled to qualified immunity").

**iv. Robert Lozano**

Much like his arguments regarding Osborne, Plaintiff's arguments regarding Lozano are largely undeveloped. From the best the Court can tell, Plaintiff argues that Lozano knew that Plaintiff made multiple sick call requests, but Plaintiff did not receive the requested medical care. *See* [R. 88, p. 6]. Plaintiff also cites to Lozano's testimony that he did not necessarily see every sick call form and his testimony that he could not say with certainty what information was conveyed to medical personnel about Plaintiff. *Id.* From this, Plaintiff argues, "[a] reasonable

[12] This is true regardless of which test is applied (*Brawner* or *Farmer*). Under the more-difficult-to-prove *Farmer* test, Plaintiff must show that the defendant perceived facts from which to infer, and did infer, a substantial risk to the detainee and then disregarded that risk.

officer would have known that failing to ensure medical staff received an inmate's complaints for sixteen consecutive days posed a substantial risk of serious harm." *Id.*

When evaluating the parties' arguments as to Lozano, the Court again notes that it is not obligated to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d at 665. Nevertheless, the Court has reviewed the evidence of record and concludes that no reasonable jury could find Lozano was deliberately indifferent to a serious medical need. The Court briefly reviews some of the relevant evidence of record.

During the relevant time frame, Lozano, like Osborne, was one of the jail officers on "medical duty." [R. 74, p. 9:17–19 (Lozano Depo.)]; *see also* [R. 76, pp. 21:6–25, 22:1–9 (Cox Depo.)]. In his role in the medical unit, Lozano would complete sick call forms for inmates, filling out relevant information like blood pressure or heart rate, and he would then call Nurse Glass and inform her of the sick call request. [R. 74, pp. 14:2–8]. Sometimes, Nurse Glass would "prescribe" medication over the phone, and Lozano would write out her instructions. *Id.* at 14:8–16. For example, if an inmate completed a sick call request for a headache, Nurse Glass might instruct the jail officers to provide five hundred milligrams of Tylenol once per day, and Lozano would write this out on the form. *Id.* at 14:8–19. The form was then placed "in a little slot." *Id.* at 14:19. When Nurse Glass came to the detention center (about once a week), she would review and sign off on the forms. *Id.* at 14:20–25.

Regarding his interactions with Plaintiff, Lozano testified that he was not present on the day Plaintiff arrived at the detention center, but shortly thereafter, he handled a sick call for him, in which it appears Plaintiff advised he was detoxing. *See, e.g.*, [R. 74, p. 46:11–22]. He testified that he called Nurse Glass in response to the sick call request, "told her about the detox, what he's going to be detoxing from," and she then prescribed certain medications. *Id.* at 46:13–16. Lozano

then filled out Plaintiff's MAR form, including the list of medication names and directions for their administration, "per Jessica Glass." *Id.* at 24:1–23, 43:2–4. He testified that he "wouldn't write anything on this MAR that [Nurse Glass] didn't tell me to put on that MAR[]," so he must have spoken to Nurse Glass and advised "about the detox." *Id.* at 46:11–22. Glass, for her part, testified that she did not recall having a discussion with jail staff about Plaintiff and his medications. [R. 77, p. 34:12–25 (Glass Depo.)].

Lozano also testified that, in addition to the sick call request regarding his detox, Plaintiff requested "medical slips," and Lozano took him medical slips "several times." *Id.* at 50:3–5. He testified that he could recall completing the sick call form to "get him on his detox meds," and he "took another sick call request from [Plaintiff] for his blood pressure." *Id.* at 53:2–11. Each time, he testified, the forms "went to the med room, Jessica Glass was called, that whole deal, and then it went in his file." *Id.* at 53:12–15. However, Lozano could not recall if Nurse Glass personally saw Plaintiff during his stay at the detention center. *Id.* at 51:1–4. He also testified that he was not a supervisor, and if another jail officer took a sick call request, that did not mean that Lozano saw that request. *Id.* at 84:20–24. Instead, the officer was supposed to place the sick call request in a basket for Lozano, Osborne, or another medical duty officer (Erica Brock) to review. *Id.* at 85:8–16.

Lozano further testified that he distributed medications to Plaintiff during "med pass" in the morning and afternoon, and he also served lunch. *Id.* at 38:1–9, 49:23–25, 50:1–2. Lozano was able to observe Plaintiff on those occasions. *Id.* When asked if he observed any change in Plaintiff's condition during his stay, Lozano testified that "[a]t first, he seemed to be getting a little better, but not quite better." *Id.* at 58:21–24. When asked to elaborate, Lozano testified the Plaintiff was "getting a little better" before he had a seizure on December 29, 2026. *Id.* at 59:22–25, 60:1–

2. On that date, Lozano had already ended his shift but went back upstairs and found Plaintiff seizing on the floor. *Id.* at 60:2–5. Lozano immediately called an ambulance. *Id.* at 60:2–6.

In reviewing this evidence, the Court first notes that Plaintiff does *not* suggest that Lozano was deliberately indifferent when he observed Plaintiff having a seizure on December 29, 2026 and immediately contacted emergency medical services. Instead, Plaintiff focuses only on the pre-seizure events and argues that Lozano knew that Plaintiff made multiple sick call requests, but Plaintiff did not receive the requested medical care. *See* [R. 88, p. 6]. However, on these facts, no reasonable jury could find that Lozano was deliberately indifferent to a serious medical need. Like Osborne, Lozano was apparently aware that Plaintiff was detoxing from Suboxone; however, "that knowledge *alone* did not require [him] to seek medical care for [Plaintiff], particularly since withdrawal 'typically may be managed in a prison setting and indeed frequently is managed there.'" *Helphenstine*, 60 F.4th at 321 (quoting *Speers*, 196 F. App'x at 396) (emphasis added). Moreover, Lozano testified that, upon receiving a sick call form requesting detox meds, he contacted Nurse Glass, and Plaintiff was ultimately placed on a detox protocol. And Plaintiff does not suggest that Lozano refused to provide a sick call request form or otherwise refused to contact medical personnel; he does not even argue that Lozano was aware that Plaintiff had not been seen by medical staff. And importantly, he does not argue, much less point to evidence of record, that Lozano knew, or should have known, that Plaintiff was detoxing from a *benzodiazepine*.[13] Indeed,

[13] At his deposition, Lozano was asked if he recalled Plaintiff asking for his "benzodiazepines or Suboxone, either one," and Lozano testified that he could not "really recall," and he makes the comment that "sure he did ask for it and [was] sure he was told that it was not allowed there." [R. 74, p. 54:17–22]. It is not clear from Lozano's testimony that Plaintiff ever asked for benzodiazepines, and Lozano repeatedly states that cannot recall. *See id.* at 55:5–14. And importantly, Plaintiff never points to this testimony or argues that Lozano knew or should have known that Plaintiff took benzodiazepines. *See* [R. 88]. Regardless, the Sixth Circuit has explained that a prison nurse does not *know* that an inmate is taking a certain drug "just because he says so," since "[a]n inmate might claim to have prescriptions for narcotics drugs in an effort to get those drugs from a nurse." *Whyde v. Sigsworth*, No. 22-3581, 2024 WL 4719649, at *3 (6th Cir. Nov. 8, 2024). Applying that same logic here, where the medical questionnaire, signed by the Plaintiff, did not list any benzodiazepines, Lozano would not necessarily have known Plaintiff was withdrawing from a benzodiazepine just because Plaintiff asked for that drug.

no benzodiazepines are listed on the medical questionnaire form signed by Plaintiff. *See* [R. 85-4].

Plaintiff must prove that Lozano acted recklessly in the face of an unjustifiably high risk of harm that was either known or so obviously that it should have been known. But here, Plaintiff fails to cite any record evidence indicating that Lozano knew, or had reason to know, of any risk to Plaintiff's health, much less an unjustifiably high or substantial risk. Indeed, Lozano testified that, based on his daily interactions with Plaintiff, Plaintiff's condition appeared to be improving. [R. 74, pp. 59:22–25, 60:1–2]. As such, his § 1983 deliberate indifference claim against Lozano must fail.[14]

The Court will therefore grant summary judgment on the § 1983 deliberate indifference claim (Count III) asserted against Lozano in his individual capacity. *See Estate of Owensby*, 414 F.3d at 602 (explaining that, when "the facts alleged fail to establish a constitutional violation, then the inquiry ends and the officer[s] [are] entitled to qualified immunity").

To summarize its rulings on the deliberate indifference claims against the officers in their individual capacities, the Court finds that each officer is entitled to qualified immunity, and it will therefore grant summary judgment as to each individual officer (Ferguson, Collett, Osborne, and Lozano). In doing so, the Court acknowledges Plaintiff's concerns about certain missing records. Apparently, the detention center's electronic JailTracker system crashed in late 2022, which resulted in the loss of certain electronic records. *See, e.g.*, [R. 81, p. 35:1–10 (Ferguson Depo.)]. And although some hard copies of documents were kept in Plaintiff's medical file at the detention center, an officer took that file with him during Plaintiff's ambulance transfer on December 29,

---

[14] For the same reasons, Plaintiff's claim could not survive under the more-difficult-to-meet *Farmer* test, as Plaintiff would have to demonstrate that Lozano perceived facts from which to infer, and did infer, a substantial risk to Plaintiff and then disregarded that risk.

2022, and the file was never returned. *See, e.g.*, [R. 78, pp. 14:11–25, 15:1–23 (Griffin Depo.)]. In passing, Plaintiff argues that "the missing records create a genuine issue of material fact and warrant an adverse inference against Defendants." [R. 88, p. 7]. Plaintiff cites no law or authority in support of this position, however. He further argues that "[a] jury could reasonably conclude that the missing records would have documented [Plaintiff's] repeated requests for medical attention and the jail's failure to respond." *Id.* But even without those written documents, the evidence of record indicates that Plaintiff *did* make repeated requests for medical attention, as the Court has already discussed. However, for all the reasons already explained, even with those repeated requests for medical attention, no reasonable jury could find that these four officer defendants were deliberately indifferent to a serious medical need (under *either* the *Brawner* or *Farmer* tests). As such, they are entitled to summary judgment.

**3. Plaintiff's § 1983 Deliberate Indifference Claim (Count III) Against the Individual Officers in their Official Capacities**

As noted, Plaintiffs bring their § 1983 deliberate indifference claim against the individual Bell County defendants in both their individual and official capacities. The individual capacity claims are addressed above. *See supra* Section III(B)(2). To the extent Plaintiff attempts to assert a claim against the officers in their official capacities, those claims duplicate the one against Bell County Fiscal Court, which is discussed in more detail below. *See infra* Section III(B)(4); *Graham*, 473 U.S. at 165–66 (explaining that the real party in interest is the governmental entity); *Kraemer v. Luttrell*, 189 F. App'x 361, 366 (6th Cir. 2006) ("Suing a municipal officer in his official capacity for a constitutional violation pursuant to 42 U.S.C. § 1983 is the same as suing the municipality itself. . . ."); *Michalak v. Michigan State Police Dept.*, No. 2:25-cv-11257, 2025 WL 2159028, at *4 (E.D. Mich. July 30, 2025) (explaining that suing a municipal officer in his or her official capacity is the same as suing the municipality itself); *Chadwell v. Caraway*, No. 5:22-cv-

39-BJB, 2022 WL 16747289, at *2 (W.D. Ky. Nov. 7, 2022) ("An official-capacity suit against a municipal employee . . . is construed as a suit against the municipality itself . . . .").

Therefore, the Court will grant summary judgment on the § 1983 claim (Count III) against the individual Bell County Defendants—that, is Ferguson, Collett, Lozano, and Osbourne —to the extent they are sued in their official capacities.

**4. Plaintiff's § 1983 *Monell* Claim (Count III) Against Bell County Fiscal Court**

Plaintiff also seeks to impose municipal liability on Defendant Bell County Fiscal Court. The Supreme Court has explained that "Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies." *Monell v. Dept. of Social Servs. of City of New York*, 436 U.S. 658, 690 (1978). However, the Supreme Court has made clear that "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* Instead, counties and other municipalities "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* Accordingly, to prove "a municipal-liability claim under § 1983, the plaintiff must allege the deprivation (1) of a right secured by the Constitution or laws of the United States, (2) that was directly caused by a municipal policy or custom." *Nichols v. Wayne Cnty., Michigan*, 822 F. App'x 445, 449 (6th Cir. 2020) (citing *Hardrick v. City of Detroit*, 876 F.3d 238, 243 (6th Cir. 2017)). To do so, the plaintiff can rely on one of four recognized theories: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence

of federal rights violations." *Helphenstine*, 60 F.4th at 323 (quoting *Burgess v. Fischer*, 75 F.3d 462, 478 (6th Cir. 2013)).

In the present case, Plaintiff's complaint and his briefing on this claim are less than clear. As a result, the Court is left guessing as to exactly what theory or theories Plaintiff relies upon to support his *Monell* liability claim. For instance, his complaint makes multiple references to the alleged actions or inactions of "Defendant supervisors," which could plausibly indicate his intention to pursue one of the above-listed theories, such as "the existence of a policy of inadequate training or supervision," or even "that an official with final decision making authority ratified illegal actions." *See, e.g.*, [R. 1, ¶ 90 ("Defendant supervisors had actual or constructive knowledge that their subordinates were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury and the Defendant supervisors' response to said knowledge was so inadequate as to show deliberate indifference or tacit authorization of these constitutional injuries.")]. But here, at the summary judgment stage, he fails to develop this argument in his response brief and fails to cite to *any* evidence in support of these allegations. Indeed, in his response, Plaintiff makes no allegations and cites no evidence regarding the actions of any supervisor-defendant when addressing his *Monell* claims. At most, Plaintiff cites to the various above-listed theories in his response brief and argues that "[t]he evidence here supports multiple theories," yet he wholly fails to clearly identify which theories he relies on or what evidence supports which theory. [R. 88, p. 9]. Put simply, Plaintiff's arguments on this claim are so undeveloped that the Court cannot even identify the exact nature of this claim. Such undeveloped arguments are considered waived. *See Robards*, 623 F. Supp. 3d at 821 n.2 ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient

for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." (alteration omitted) (quoting *McPherson*, 125 F.3d at 995–96)).

Regardless, as the Bell County Defendants correctly note, a *Monell* claim requires an underlying constitutional violation. *See* [R. 85-2, p.29]; [R. 95, p. 11]; *Stafford v. Sugarcreek Township, Ohio*, No. 25-3925, 2026 WL 1865449, at *5 (6th Cir. 2026) ("[A] city can't be liable under *Monell* without an underlying constitutional violation." (citing *Codrington v. Dolak*, 142 F.4th 884, 896 (6th Cir. 2025)); *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) ("If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." (citation omitted)). The Court has found that the Bell County Defendants are entitled to judgment as a matter of law on the underlying deliberate-indifference claims against the individual officer defendants. *See supra* Section III(B)(2). As such, Plaintiff's *Monell* liability claim against Bell County Fiscal Court fails.

**5. Plaintiff's § 1983 *Monell* Claim (Count III) Against ACH**

Plaintiff also brings a § 1983 claim against ACH based on similar allegations supporting the municipal liability claim against Defendant Bell County Fiscal Court. *See, e.g.*, [R. 1, ¶¶ 78, 91]. True, a private corporation that provides health care services to prison inmates may be liable under § 1983, but "only when execution of the private contractor's policy or custom inflicts the alleged injury." *Perry v. Corizon Health, Inc.*, No. 17–2489, 2018 WL 3006334, at *1 (6th Cir. June 8, 2018) (citing *Monell*, 436 U.S. at 694; *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005)). Thus, "a plaintiff must establish that his or her constitutional rights were violated and that a policy or custom of the [private contractor] was the moving force behind the deprivation of the plaintiff's rights." *Id.* (quoting *Miller v. Sanilac Cnty.*, 606 F.3d 240, 255 (6th Cir. 2010)) (cleaned up). Such claims have failed to survive a motion to dismiss where the plaintiff's complaint failed

to allege any facts showing that the private contractor had a policy, practice, or custom resulting in the violation of the plaintiff's constitutional rights. *Id.* at *2.

As to this claim, ACH first argues that it necessarily fails because there was no underlying unconstitutional act attributable to ACH. [R. 87, pp. 9–10]. Plaintiff, in response, argues that this assertion "is wrong." [R. 89, p. 8]. Plaintiff then goes on to address the *Brawner* test as to Glass, an ACH employee.[15] From, this, the Court understands Plaintiff's argument to be that a constitutional violation *did* occur, and more specifically, that Glass (who is not a defendant in this suit) was deliberately indifferent to Plaintiff's serious medical needs.

In support of this argument, Plaintiff argues that (1) he suffered an objectively serious medical need because he experienced withdrawal, citing only to the now-excluded testimony of Drs. Geci-Black and Odago; and (2) there is a genuine dispute of material fact "about whether Glass knew of [Plaintiff's] condition and failed to act" because she was listed as the prescriber for Plaintiff, Lozano testified that he had called her about Plaintiff's detox, and Glass testified that inmates suffering from withdrawal should be sent to the emergency room. *Id.* at 8–9. From this, Plaintiff argues that "[a] reasonable jury could conclude that ACH's employees recklessly disregarded the obvious risk that an inmate on prescription medications would suffer serious harm if those medications were abruptly discontinued." *Id.* at 9.

Like Plaintiff's other arguments, this argument, too, is largely undeveloped, and Plaintiff cites no law or authority to support his position. Plaintiff also mischaracterizes the record. Nurse Glass testified that an inmate detoxing from *benzodiazepines* would need to be treated "in some

[15] The parties do not dispute that "[p]rivate companies, and their employees, that perform traditional state functions, such as providing medical care to inmates, are state actors for the purposes of § 1983." *Green v. Tennessee*, No, 20-6396, 2021 WL 619727, at *1 (6th Cir. Sept. 8, 2021) (quoting *Martin v. Warren Cnty.*, 799 F. App'x 329, 337 (6th Cir. 2020)) (cleaned up).

sort of managed care setting," [R. 77, p. 47:19–25], like "the emergency room hospital, that type of thing," *id.* at 32:9–13, but Plaintiff cites to no evidence that Nurse Glass was aware that Plaintiff was detoxing from benzodiazepines. Indeed, during her deposition, Nurse Glass reviewed the medications listed on Plaintiff's medical intake forms—which, again, was signed by Plaintiff—and confirmed that none of those medications were benzodiazepines. *Id.* at 67:21–25, 68:1–8. She further confirmed that, based on that list of medications, she would *not* have directed the jail staff to send Plaintiff to the emergency room for immediate treatment. *Id.* at 68:9–13. Plaintiff therefore fails to cite any evidence whatsoever suggesting that Nurse Glass knew or should have known of Plaintiff's condition (i.e., that he was withdrawing from benzodiazepines) and failed to act accordingly.[16] This is the only argument Plaintiff offers in support of his position that an underlying constitutional violation was committed by an ACH employee. The Court therefore concludes that there was no underlying constitutional violation that could support Plaintiff's § 1983 *Monell* claim against ACH. As such, the Court will grant summary judgment in favor of ACH on this claim.

**6. Plaintiff's § 1983 Conspiracy Claim (Count IV) Against All Defendants**

In his complaint, Plaintiff brings a claim for "conspiracy to committ (sic) constitutional violations under 42 U.S.C. § 1983." *Id.* ¶¶ 99–105. In that complaint, he alleges, in a rather conclusory fashion, that the defendants "acted jointly and in concert to deprive Plaintiff" of his constitutional rights; they "committed overt acts to accomplish this constitutional deprivations and injuries"; and they agreed to disregard and ignore, and did disregard and ignore, Plaintiff's requests for medication and medical care. *Id.* The Bell County Defendants characterize this as a claim for

[16] This is true regardless of which test, *Brawner* or *Farmer*, is applied. Plaintiff has failed to point to any facts suggesting that Nurse Glass should have been aware of a substantial risk of harm to Plaintiff, and he certainly has not shown that she *was* aware of such a risk.

conspiracy to interfere with civil rights under 42 U.S.C. § 1985. [R. 85-2, pp. 29–30]. However, nowhere in Plaintiff's complaint or briefing does he cite to § 1985, and the Court understands that Plaintiff instead brings a §1983 civil conspiracy claim. *See generally Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011) (discussing a "civil conspiracy under § 1983"); *Mulcahey v. Township of Chocolay, Michigan*, No. 25-1396, 2026 WL 64236, at *4 (same); *MacMaster v. Busacca*, No. 2:21-cv-11052, 2025 WL 308123, at *17 (E.D. Mich. Jan. 27, 2025) (same).

The Bell County Defendants move for summary judgment on this count, arguing for the first time that such conclusory allegations are insufficient to state a claim under 42 U.S.C. § 1985, presumably invoking the standard applicable to motions to dismiss. [R. 85-2, p. 30]. The Court is at a loss as to why the Bell County Defendants waited until the summary judgment stage to make such arguments. *See generally Webb v. United States*, 789 F.3d 647, 670 (6th Cir. 2015) ("It is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under . . . § 1983." (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987)) (internal quotation marks omitted). Moreover, as the Court has already explained, Plaintiff's Count IV arises under § 1983, not § 1985. Regardless, the Bell County Defendants also argue that, aside from the deficiencies in the complaint, this claim must fail because Plaintiff cannot point to any evidence to support such a claim. *Id.* That is, they also address the standard applicable at the summary judgment stage. And while they refer to the elements applicable to a § 1985 claim, their arguments are also relevant to this Court's consideration of a civil conspiracy claim arising § 1983.

As the Sixth Circuit has explained, "A civil conspiracy under § 1983 requires 'an agreement between two or more persons to injure another by unlawful action.'" *Mulcahey*, 2026 WL 64236, at *4 (quoting *Bazzi*, 658 F.3d at 602). To prevail on such a claim, the plaintiff "must

show that (1) a 'single plan' existed, (2) [the defendants] "shared in the general conspiratorial objective' to deprive [the plaintiff] of his constitutional (or federal statutory) rights, and (3) 'an overt act was committed in furtherance of the conspiracy that caused injury' to [the plaintiff]." *Bazzi*, 658 F.3d at 602 (quoting *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985)).

Defendants argue generally that there is no evidence of any sort of agreement or plan between any of the jailers, or between the jail staff and any employee of ACH. [R. 85-2, pp. 30–32]. They also argue that there is "a bereft of any evidence of a conspiratorial objective to deprive Plaintiff of his supposed criminal rights," and there is likewise no evidence of an overt act committed in furtherance of any such conspiracy. *Id.* at 32. Essentially, then, they have pointed to an absence of evidence to support an essential element of Plaintiff's § 1983 conspiracy claim. *Celotex Corp.*, 477 U.S. at 323. As a result, Plaintiff, as the non-moving party, must produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford*, 48 F.3d at 205 (citation omitted).

Plaintiff's response does little to satisfy this burden. *See* [R. 88, pp. 9–10]. In roughly a single page, Plaintiff fails to cite to or discuss the specific elements of a § 1983 claim, and instead cites only to the fact that he made several requests for sick call forms and submitted several sick call requests but was never seen by medical staff. *Id.* at 10. He does not identify a "single plan" among any of the defendants, nor allege that they shared any conspiratorial objective, and he does not cite to any overt acts in support of any alleged conspiracy. *Id.* At most, he references a "disconnect" between the jail staff who processed Plaintiffs' sick call requests and the medical staff members, which he refers to as a "complete breakdown of communication." *Id.* He argues that, from this, "a jury could infer an agreement to deprive Mr. Howard of his constitutional rights." *Id.*

The Court disagrees. True, "direct evidence of an express agreement among all the conspirators to conspire" is rare, and "circumstantial evidence may provide adequate proof of conspiracy." *Webb*, 789 F.3d at 671 (quoting *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000)) (internal quotation marks omitted). However, the plaintiff "has the burden to come forward with some evidence 'from which to infer that the defendants acted in concert' in performing their unlawful acts." *Peterson v. Dow*, No. 23-11401, 2024 WL 498444, at *6 (E.D. Mich. Nov. 18, 2024) (quoting *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003)). Plaintiff here has wholly failed to cite to record evidence from which a jury could infer that the defendants entered into an agreement to deprive him of his constitutional rights. *See Spadafore*, 330 F.3d at *6 (granting summary judgment on a § 1983 claim where the plaintiff alleged that the defendants made false statements but did not produce evidence suggesting that they had a single plan when they made those statements); *Peterson*, 2024 WL 498444, at *6 (granting summary judgment on a § 1983 civil conspiracy claim supported only by vague allegations of a conspiracy); *cf. Webb*, 789 U.S. at 671 (finding sufficient circumstantial evidence that could enable a reasonable jury to infer the existence of a shared conspiratorial plan based on evidence of false testimony, false reporting, and alteration of recordings, among other things).

Regardless, Plaintiff's § 1983 civil conspiracy claim "requires an underlying constitutional violation." *Stafford*, 2026 WL 1865449, at *5 (citing *Susselman v. Washtenaw Cnty. Sheriff's Off.*, 109 F.4th 864, 872 (6th Cir. 2024); *PB&J Towing Serv. I & II, LLC v. Hines*, No. 20-6170, 2022 WL 390599, at *5 (6th Cir. Feb. 9, 2022)); *see also PB&J Towing*, 2022 WL 390599, at *5 ("As we have held before, a claim for civil conspiracy under 42 U.S.C. § 1983 exists only if the plaintiff has established a separate and actionable constitutional injury."). Here, the Court has already determined that Plaintiff's §1983 deliberate indifference claims fail to survive summary judgment,

and as such his § 1983 civil conspiracy claim, which relies on the success of those deliberate indifference claims, fails as well. *See id.* ("[T]here was no constitutional violation here, so Stafford's civil-conspiracy claim fails."); *Susselman*, 109 F.4th at 872 ("As noted, however, [the plaintiffs] has not plausibly alleged that receiving the second ticket deprived him of his constitutional rights. Thus, any 'plan' between [the defendants] to issue that ticket cannot establish an agreement to engage in unconstitutional conduct."); *PB&J Towing*, 2022 WL 390599, at *5 ("[S]ince [the plaintiff] has failed to allege facts or provide evidence sufficient to establish its procedural-due-process claim, its civil-conspiracy claim against the individual defendants must also fail.").

Accordingly, the Court will grant summary judgment on Plaintiff's § 1983 civil conspiracy claim (Count IV) as to all Defendants.[17]

## IV. CONCLUSION

For the reasons set forth above, the Court will grant ACH's Motion to Exclude Expert Testimony, [R. 86]. As to the motions for summary judgment, the Court finds that the defendants, as the moving parties, have satisfied their burden "of informing the district court of the basis for [their] motion[s], and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which [they] believe[] demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323; *see also Anderson*, 477 U.S. at 256. In response, Plaintiff, as the non-moving party, failed to produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc.*, 48 F.3d at 205. Indeed, as the Court

[17] ACH does not appear to discuss this claim in its Motion for Summary Judgment. *See* [R. 87]. However, Plaintiff clearly addresses the claim as to all Defendants when responding to the Bell County Defendants' Motion for Summary Judgment. *See* [R. 88, pp. 9–10]. As such, the Court finds it appropriate to grant summary judgment on this claim as to all Defendants.

has explained, many of Plaintiff's arguments were, at best, undeveloped. And importantly, the Court is not obligated to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d at 665. Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id.* As the Court has explained above, Plaintiff has wholly failed to satisfy his burden in this respect, and the Court will not search the record for him to identify any genuine issues of material fact. As such, and for the reasons set forth above, the Court will grant summary judgment on each claim, as to all Defendants.

Accordingly, the Court being sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1. The Bell County Defendants' Motion for Summary Judgment, [**R. 85**], is **GRANTED**.
2. ACH's Motion to Exclude Expert Testimony, [**R. 86**], is **GRANTED**.
3. ACH's Motion for Summary Judgment, [**R. 87**], is **GRANTED**.
4. The Bell County Defendants' Motion to Allow Additional Briefing on Summary Judgment, [**R. 102**], is **DENIED as moot**.
5. A separate judgment shall follow.

This the 29th day of September, 2026.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF KENTUCKY